## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                      )

**ELIZABETH M. TAMPOSI,**        )
                                        )

       **Plaintiff,**             )
                                        )     **Civil Action No.**

       **v.**                     )     **10-12283-FDS**
                                        )

**STEPHANIE DENBY, Esq.; BURKE**   )
**WARREN MACKAY & SERRITELLA, P.C.;**  )
**MICHAEL WEISMAN, Esq.; REBECCA**  )
**MCINTYRE, Esq..; WEISMAN &**    )
**MCINTYRE, P.C.; JULIE SHELTON, Esq.,** )
**individually and in her capacities as Trustee of** )
**the Elizabeth M. Tamposi GST Exempt Trust** )
**and the Elizabeth M. Tamposi Trust, both**  )
**created under the Samuel A. Tamposi, Sr. 1992** )
**Trust, and in her capacity as Trustee of the**  )
**Elizabeth A. Tamposi Trust, created under the** )
**Samuel A. Tamposi, Sr. 1994 Irrevocable Trust;** )
**BUTLER, RUBIN, SALTARELLI & BOYD,**  )
**LLP; and BAKER & DANIELS, LLP,**   )
                                        )

       **Defendants.**           )
_____)

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT ON CROSS-CLAIMS

**SAYLOR, J.**

     This is a claim for legal malpractice arising out of prior litigation in New Hampshire concerning the administration of family trusts.  Plaintiff Elizabeth M. Tamposi brought claims in this Court against various attorneys and law firms that had represented her interests in the prior litigation, alleging legal malpractice, breach of fiduciary duty, and unjust enrichment.  Three defendants—Butler, Rubin, Saltarelli & Boyd, LLP; Faegre Baker Daniels LLP (successor in interest to Baker & Daniels, LLP); and Julie Shelton (together, the "Shelton Parties")—filed

counterclaims against Tamposi.  All eight defendants filed cross-claims against multiple other defendants.

On December 23, 2014, the parties filed a joint stipulation dismissing all claims by and against Tamposi and the majority of the cross-claims.  The only claims remaining in the case are the cross-claims for legal malpractice filed by the Shelton Parties against all other defendants.

Four motions for summary judgment have been filed as to those cross-claims—one by Michael Weisman, Rebecca McIntyre, and Weisman & McIntyre, P.C. (together, the "W&M Parties"); one by McIntyre alone; one by Burke, Warren, MacKay, & Serritella, P.C., and Stephanie Denby (the "Denby Parties") as to the cross-claims of only Butler Rubin and Baker Daniels; and one by the Denby Parties as to the cross-claims of all of the Shelton Parties.

For the reasons set forth below, the motion of the Denby Parties for summary judgment as to the cross-claims of Butler Rubin and Baker Daniels will be granted, and all other motions will be denied.

## I.   Background

The following facts are undisputed unless otherwise noted.

### A.   The Samuel A. Tamposi, Sr. Trusts

Samuel A. Tamposi, Sr. was a prominent and successful real estate developer in New Hampshire.  (W&M SMF ¶ 3).  In 1992, as part of his estate plan, he established the Samuel A. Tamposi, Sr. 1992 Trust (the "1992 Trust") and named himself as beneficiary during his life and his six children as beneficiaries after his death.  (*Id.*).  *See Shelton v. Tamposi*, 164 N.H. 490, 493, 62 A.3d 741, 744 (2013).  He amended the trust four times prior to his death.  *Id.*; (Dkt. No. 209, Ex. 6, at 31-45).  In its final form, the trust provided that upon Samuel's death, the trust

corpus was to be divided into twelve separate sub-trusts—six containing assets exempt from the federal generation-skipping transfer tax and six containing non-exempt assets. *Shelton*, 164 N.H. at 493, 62 A.3d at 744. As provided by the 1992 Trust, the twelve sub-trusts would be divided equally among Samuel's six children, with each of the six being named as the primary beneficiary of one "GST exempt" trust and one "non-exempt" trust. (Denby SMF ¶ 3); *Shelton*, 164 N.H. at 493, 62 A.3d at 744.[1]

Article TENTH of the 1992 Trust provided that each of the twelve sub-trusts would constitute a separate and distinct trust, but that each could be combined with the other trusts in a common fund for the convenience of administration. (*Id.*). In that way, legal title to the trust property would be held in the name of the larger Samuel A. Tamposi, Sr. Trusts, while equitable title would rest with the twelve individual trusts. (*Id.*).

Article TENTH-B of the 1992 Trust, as amended, specified that two of Samuel's sons—Samuel Tamposi, Jr. ("Sam") and Stephen Tamposi ("Steve")—were to serve as "investment directors" for the entire trust property and for the twelve individual trusts. (*Id.* ¶ 4; Resp. to Denby SMF ¶ 4). The enumerated responsibilities and powers of the investment directors included, but were not limited to, "the management, control, handling, financing, refinancing and structuring of any and all real estate interests and other operating entities from time to time included in the trust property" and the "full power and authority to direct the retention or sale of all other assets from time to time included in the trust property and to direct

---

[1] Samuel also established the Samuel A. Tamposi 1994 Irrevocable Trust prior to his death; it contained similar terms to those of the 1992 Trust, and it was split into six sub-trusts (one for each child) upon his death. *Shelton*, 164 N.H. at 493; Compl. ¶ 10, *Shelton v. Tamposi*, No. 316-2000-EQ-00178 (N.H. Probate Court Dec. 9, 2009)). Those six sub-trusts were later consolidated with the six non-exempt sub-trusts of the 1992 Trust. *Shelton*, 164 N.H. at 493, 62 A.3d at 744-45.

the purchase of property with any principal cash included in the trust property." (1992 Trust Art.

TENTH-B(d) and (e)).

The 1992 Trust contained an *in terrorem* clause that provided, in relevant part:

> If any person shall at any time commence or join in the prosecution of any
> proceedings in any court or tribunal . . . to have . . . this trust . . . set aside or
> declared invalid or to contest any part or all of the provisions included in . . . this
> trust . . . or to cause or to induce any other person to do so, then and in that event
> such person shall thereupon forfeit any and all right, title and interest in or to any
> portion of this trust, and this trust shall be distributed in the same manner as
> would have occurred had such person died prior to the date of execution of this
> trust.

(1992 Trust Art. FOURTEENTH).

Upon his death, Samuel's estate and trust property consisted of "various tenancies,

business entities, limited partnerships, [and] corporations and numerous parcels of real estate in

New Hampshire and Florida," and was valued at approximately $20.5 million. Order at 6,

*Shelton v. Tamposi*, No. 316-2007-EQ-2109 (N.H. Probate Ct. Aug. 18, 2010).

### B.      The Elizabeth M. Tamposi Trusts

Elizabeth ("Betty") M. Tamposi, the original plaintiff in this action, is one of Samuel's

children. When Samuel died on May 25, 1995, Betty became the beneficiary of two of the

twelve individual trusts that were sub-divided out of the 1992 Trust. (Denby SMF ¶ 1). Those

two trusts, known as the Elizabeth M. Tamposi Trusts ("EMT Trusts"), also named Betty's

children (the "Goodlander Children") as beneficiaries. (*Id.*).

In addition to her interests in the EMT Trusts, Betty also acquired minority interests in

many Tamposi holdings in which the EMT Trusts owned no interest (the "Gifted Assets").

(Denby SMF ¶ 7; Steve Dep. at 16-17). Those included ownership interests in business entities

known as Ballinger Properties LLC and Citrus Hills Holdings LLC. (Steve Dep. at 16-17).

4

### C.    Trust-Related Conflict Prior to 2007

After Samuel died in 1995 and Sam and Steve took over as investment directors, the Tamposi family experienced significant discord concerning the proper relationship between the investment directors and the trustee.  (Denby SMF ¶ 13).  In the summer of 1995, Steve and Betty discussed the possibility of a buyout of Betty's interest in the Trusts for approximately $500,000.  (*Id.* ¶ 14).  According to Steve, they discussed that possibility again some time in 1997, 1998, or 1999.  (Steve Dep. at 88-89).

On January 26, 2000, Sam and Steve, together with trustee Gerald R. Prunier, filed an action in the Hillsborough County (N.H.) Probate Court seeking a declaratory judgment as to the division of fiduciary responsibilities between the investment directors and the trustee of the 1992 Trust.  (Dkt. No. 182, Ex. 4).  The petition alleged that Betty and her brother Nicholas Tamposi ("Nick")  had expressed an interest in a separation or buyout of their beneficial interests in the trust property.  (*Id.*).

On March 17, 2000, Betty and Nick filed an action for declaratory judgment against Sam and Steve.  (Denby SMF ¶ 19; Dkt. No. 182, Ex. 17).  Among other things, the action sought a declaratory judgment as to whether the *in terrorem* clause in the 1992 Trust would trigger a forfeiture if Betty and Nick responded to the declaratory-judgment action filed by Sam, Steve, and Prunier.  (Denby SMF ¶ 19; Dkt. No. 182, Ex. 17).

On October 2, 2000, New Hampshire Probate Court Judge Raymond A. Cloutier ruled that Betty and Nick would not violate the *in terrorem* clause by seeking to uphold fiduciary standards under the trust and New Hampshire law, as long as they did "not challenge or attempt to challenge the validity of the trust or the authenticity of the [trust] documents or signatures."

5

(Denby SMF ¶ 20; Dkt. No. 182, Ex. 19).

In September 2001, Betty filed another action against Sam, Steve, trustee Prunier, and trustee David Tully alleging breach of fiduciary duties.  (Denby SMF ¶ 21; Dkt. No. 182, Ex. 20).  Among other things, the 2001 lawsuit sought removal of Sam and Steve as investment directors and Prunier as trustee of the 1992 Trust "and the individual trusts established thereunder."  (Denby SMF ¶ 21; Dkt. No. 182, Ex. 20, at 49).  The complaint alleged that Prunier, Sam, and Steve had been using the *in terrorem* clause to "stifle dissent."  (Denby SMF ¶ 21).

In late 2001, Betty and Nick withdrew their complaint for breach of fiduciary duty in order to engage in settlement discussions.  (Denby SMF ¶ 22).  Genus Resources, LLC was hired to mediate the dispute.  (*Id.*).  On May 2, 2002, Genus put out an Assessment Report that stated in part:

> Betty wants essentially four things: [1] access on a regular basis to cash generated by her interests in the family assets in order to finance personal choices for herself and her family; [2] independence for herself and her children from control of their lives by the [i]nvestment [d]irectors of the Tamposi Trusts; [3] more professional management of the Tamposi family businesses, management which adheres to best practices standards; and [4] continuing her ownership of the Tamposi family business interests as they comprise an intact business.

(Genus Assessment Rep. at 52-53).  The mediation was ultimately unsuccessful.  (Denby SMF ¶ 23).  Betty's 2001 complaint was not reinstated after the failed mediation.  (*Id.*).

On June 16, 2004, Betty sent a letter to Sam, Steve, and two of her other siblings requesting a buyout "instead of the settlement agreement that would have left [her] involved in family business affairs for the long run."  (Dkt. No. 182, Ex. 22).  The letter also requested that Sam and Steve resign as investment directors of the EMT Trusts.  (*Id.*).

In July 2004, Betty and Nick agreed to sell their ownership interests in certain assets to Sam and Steve for $17 million, pursuant to a Letter of Intent that expressed that agreement in writing.  (Denby SMF ¶ 25; Dkt. No. 182, Ex. 23).

On November 13, 2006, Betty and her siblings entered into a settlement agreement in which each signatory agreed to release all rights of action against one another that related to the September 2001 lawsuit and two other suits that had also been filed in New Hampshire probate court and later withdrawn.  (W&M SMF ¶ 6; Settlement Agreement at 2-3).  The terms of the settlement agreement included (but were not limited to) the following:  (1) Sam and Steve would resign as investment directors of all assets of the EMT Trusts except for ten; (2) Betty would release any claim for breach of fiduciary duty against her siblings or trustees Prunier and Tully; (3) Prunier and Tully would resign as trustees of the EMT Trusts; (4) Betty would nominate Richard Couser as the successor trustee of the EMT Trusts; and (5) Betty would be responsible for her own legal fees, but could seek reimbursement from the EMT Trusts.  (Denby SMF ¶ 27).

Shortly after the settlement agreement was signed, Couser became ill and became unable to serve as trustee.  (*Id.* ¶ 7).  He officially resigned on May 18, 2007, before taking possession of any of the trust assets from Prunier.  (*Id.* ¶ 29).

As of November 19, 2006, Sam and Steve served as investment directors with respect to ten of the assets held in the EMT Trusts.  (Denby SMF ¶ 6; Settlement Agreement at 4).  They also remained as managers of all assets in the EMT Trusts and retained operating control over them.  (Betty Dep. Apr. 8, 2014 at 435-36; Steve Dep. at 150-52).  They also remained, and still remain, managers of Betty's Gifted Assets.  (Denby SMF ¶ 6; Steve Dep. at 16-17).

One of the ten assets for which Sam and Steve remained investment directors after the

settlement agreement was Tamposi, LLC.  (Denby SMF ¶ 30).  Tamposi, LLC owned 50 Class B

Units of N.E.S.V.I., LLC, the entity that at the time owned the majority interest in the Boston

Red Sox.  (*Id.*).  The company also was a party to an agreement under which it could require

N.E.S.V.I., LLC to purchase all or some of the Class B Units it owned (the "Put Option").  (*Id.*;

Dkt. No. 182, Ex. 27, ¶ 13).  The Put Option provided that it could be exercised during the first

90 days of each calendar year beginning in 2004, with the final option period terminating in

April 2008.  (Dkt. No. 182, Ex. 27, ¶ 13).[2]

### D.  The Hiring of Julie Shelton and Stephanie Denby

Julie Shelton is a trial lawyer, licensed to practice law in Illinois, with approximately 30

years of litigation experience.  (*Id.* ¶ 39; Denby SMF II ¶ 1; Denby Dep. at 217).  Shelton and

Betty Tamposi have known each other since 1973.  (*Id.* ¶ 40).  Shelton was aware in 2001 that

Betty had sued her brothers about an issue related to her family trusts.  (*Id.*).[3]

Sometime in the spring of 2007, Betty contacted Shelton and requested help in finding a

new trustee for the EMT Trusts to replace Richard Couser.  (*Id.* ¶ 41; Shelton Dep. at 21-22).  At

that time, Shelton was a partner at Butler, Rubin in Chicago.  (Denby SMF II, Dkt. No. 206, ¶

1).[4]  She had no experience as a trust or probate lawyer, and limited knowledge of those areas of

law.  (Denby SMF II ¶ 1).

Shelton recommended an attorney named Stephanie Denby, referring to her in their

---

[2] The Put Option mandated the sale of the Class B Units at an undiscounted value and was intended to allow an open market for the sale (without the interference of Major League Baseball) and guarantee a significantly higher price than what would otherwise be obtainable.  (Denby SMF ¶ 31; Denby Dep. at 158-59).

[3] At her deposition, Shelton testified that Betty had told her in 2001 "that she had sued her brothers and that she had spent a lot of time with a lot of different documents preparing the case against them."  (Shelton Dep. at 18).

[4] On November 3, 2008, Shelton switched firms and became a partner at Baker & Daniels, LLP.  (Shelton Answer ¶ 11).  Faegre Baker Daniels LLP is the successor by merger to Baker & Daniels, LLP.  (*Id.* ¶ 11).

conversation as "somebody who I respect highly as a trust and estates lawyer." (Shelton Dep. at 22). At the time, Denby was employed by the law firm of Burke, Warren, MacKay & Serritella, P.C. in Chicago.

On April 27, 2007, Shelton sent an e-mail to Denby with the subject, "Betty Tamposi." (Denby SMF ¶ 42). In the e-mail, Shelton suggested that she, Denby, and Betty set a meeting for the morning of May 3, 2007. (Dkt. No. 182, Ex. 43).

On May 2, 2007, Shelton received a stack of materials from Betty, including the EMT Trusts, the 2001 complaint, the settlement agreement, and some financial documents. (Denby SMF ¶ 43; Dkt. No. 182, Ex. 44). She sent the originals to Denby, keeping copies of certain documents for herself. (Denby SMF ¶ 43; Dkt. No. 182, Ex. 44).

Shortly thereafter, Shelton, Betty, and Denby met at Denby's office in Chicago and spoke for several hours. (Denby SMF ¶ 42). Betty explained that she had concerns about the implications of the 2006 settlement agreement, including the level of power left to her trustee as compared to the investment directors. (Betty Dep. at 48-49). Denby shared her initial response to those concerns. (Denby SMF ¶ 42). After the meeting, Denby set up further meetings with multiple institutional trustees, including J.P. Morgan and Bank of America. (*Id.* ¶ 44). Shelton attended at least some of those meetings. (*Id.*). Ultimately, each potential institutional trustee declined to take on the trusteeship of the EMT Trusts. (*Id.*).[5]

---

[5] At Shelton's deposition, she testified as follows:

Q.    [I]s it correct that you were advised that none of the institutional trustees would be workable primarily because there wasn't enough money being generated from the trust?

A.    I was advised of that at some point, but I don't know when it was. . . .

(Shelton Dep. at 256).

After the institutional trustees declined to become involved, Betty asked Denby if she would be willing to serve as her trustee.  (*Id.* ¶ 46).  Denby declined, explaining that she generally did not act as a trustee.  (*Id.*; Denby Dep. at 130).

On May 30, 2007, Betty and Denby executed a formal engagement letter.  In the letter, Burke, Warren (through Denby) agreed to represent Betty "in conjunction with administration of your family trusts."  (Dkt. No. 182, Ex. 47).

At some point in the summer of 2007, Betty asked Denby to find out whether Shelton would agree to serve as trustee of the EMT Trusts.  (Denby SMF ¶ 52; W&M SMF ¶ 15).  In late July or early August 2007, Denby approached Shelton and asked her if she would be willing to serve.  (Denby SMF ¶ 52; Shelton Dep. at 25-26).

According to Shelton, she responded that she had "no idea how to be a trustee."  (Shelton Dep. at 26).  Shelton testified that Denby then reassured her and promised her that she would provide professional assistance.  (*Id.*).  Specifically, she testified:  "And she [Denby] said a number of different things.  I can't tell you the exact words, but basically, it was, 'I will help you every step of the way, and Betty needs you.  You don't need to worry about it.  It will be fine. You can do this.  I will help you, I will guide you and I will teach you.'"  (*Id.*).  On that representation, and specifically on the understanding that Denby would serve as trustee counsel, Shelton agreed to serve as trustee starting in August 2007.  (Denby SMF ¶ 52).

At her deposition, Denby testified as follows:

Q.        [D]id you say anything to Ms. Shelton about either the benefits to her

---

At Betty's deposition, she was asked why an agreement was not reached with any of the professional trustees; she responded:  "Stephanie Denby had told me that the trustees had declined to consider the role of trustee because of the contentiousness between the beneficiaries, my brother Nick and myself and the investment advisors." (Betty Dep. at 60).

personally or the risks to her personally if she undertook that role? . . . In the set of conversations relating to whether Ms. Shelton would become trustee.

A.     No.

(Denby Dep. at 380-81).

On August 16, 2007, Shelton began to bill Betty for her services as trustee. (Dkt. No. 193, Ex. 2, at 243). At all times while she remained trustee of the EMT Trusts, she sent invoices to Betty through her law firms—first Butler Rubin, and later Baker Daniels. (Saltarelli Aff. ¶ 2; Stanley Aff. ¶ 2).

### E.     Betty's Purported Cash Problems and Early Attempts to Resolve Them

From 2000 to 2006, Betty incurred approximately $900,000 in legal fees in connection with the initial litigation. The fees included charges by Richard Couser. (Betty Dep. Apr. 8, 2014 at 436).

In April 2005, then-trustee Prunier authorized a loan from the EMT Trusts to Betty of approximately $1.5 million to purchase a luxury home on Lake Winnipesaukee in New Hampshire. (Denby SMF ¶ 34; Betty Dep. at 508; Dkt. No. 182, Ex. 93, at 26). The purchase price of the property was approximately $1.7 million. (Betty Dep. at 526-27).

On January 26, 2007, Betty signed a contract with Cobb Hill Construction obligating herself to pay almost $1.5 million for home renovations. (Denby SMF ¶ 35; Dkt. No. 182, Ex. 30).

By mid-May 2007, Betty was experiencing a self-described "cash crunch." (Betty Dep. at 561). On May 22, 2007, she wrote an e-mail to Denby in which she requested her help in obtaining reimbursement for the attorneys' fees that she had incurred (approximately $900,000)

11

as part of the prior litigation.  (*Id.*; Dkt. No. 182, Ex. 28).  After describing the scenario to Denby

in the first portion of the e-mail, Betty wrote:  "I don't know what you can do with all this but

I'm hoping you can figure something out that will help me get the reimbursement in whole and

not staggered or not anything even, depending on what their 'mood' is. Ach!!"  (Dkt. No. 182,

Ex. 28).

On May 31, 2007, Betty sent an e-mail to Shelton in which she wrote:  "This issue

with . . . Couser is heating up.  Can you call me?"  (Dkt. No. 182, Ex. 48).  To the e-mail, she

attached a letter from Couser that, among other things, sought payment of outstanding legal fees.

(*Id.*; SMF ¶ 48).

On June 4, 2007, Betty was served with notice that her husband, Theodore Goodlander,

had filed a petition for divorce.  (Denby SMF ¶ 36; Dkt. No. 182, Exs. 31-32).  In his petition,

Ted requested an equitable division of his and Betty's assets as well as permanent spousal

support.  (Denby SMF ¶ 36; Dkt. No. 182, Ex. 31).

On June 7, 2007, Denby met with David Barradale and Pam Newkirk, two attorneys for

Prunier, to address Betty's need for additional cash flow from the trusts.  (Denby SMF ¶ 49;

Denby Dep. at 364).[6]  At the meeting, Denby informed Barradale that Betty had significant cash

needs.  (Denby SMF ¶ 49).

Also present at the June 7, 2007 meeting were CFO Jeff Knight of the Tamposi Company

and Gene Van Loan, the attorney and trustee for Nick Tamposi.  (Denby SMF ¶ 49; Denby Dep.

at 364).  Knight discussed the balance sheet and cash flow of the EMT Trusts, and explained that

Sam and Steve, in their capacity as investment directors, would be distributing $22,000 per

---

[6] As of the time of the meeting, no new trustee had been named to replace Couser (who had never taken possession of the trust assets), so Prunier was still in possession of the assets of the EMT Trusts.  (Denby SMF ¶ 49).

month to Betty.  (Denby SMF ¶ 49; Denby Dep. at 365).

On June 15, 2007, attorney Barradale sent a letter to Denby addressing the delay in finding a successor trustee to replace Couser.  (Dkt. No. 182, Ex. 49).  He noted that an initial target of July 1, 2007, had been set to name a successor trustee for both Betty's and Nick's sub-trusts, and that that date remained the target in Nick's case.  (*Id.* at 2-3).  He then stated:  "It is important to [Prunier] to have a target date of August 1, 2007 for the transition of trustee responsibilities for Betty's subtrusts. . . . It is unfair to the fiduciaries who have resigned for this issue to keep them in limbo and to otherwise hold up the transition of trustee responsibilities."  (*Id.* at 3, 4).

In his letter, Barradale also stated that on the date of the transfer of trustee responsibilities, a closing would take place during which "[t]he [t]rustees who have resigned would receive releases for the period from the effective date of the Settlement Agreement through the closing date."  (*Id.* at 2).  He further stated:  "I anticipate the [i]nvestment [d]irectors will also require a release."  (*Id.*).

On June 22, 2007, in preparation for a meeting in New Hampshire with Betty's divorce attorney, Shelton met with Denby to discuss Betty's divorce case.  (Denby SMF ¶ 53).  On that same day, Denby sent Shelton a copy of Betty's 2001 complaint and the November 2006 settlement agreement.  (*Id.*).

At some point, Shelton and Betty began to consider filing an action against Couser for legal malpractice.  On June 25, 2007, Shelton sent Denby an e-mail informing her of a recommendation Shelton had received for an attorney to handle such a lawsuit.  (Denby SMF ¶ 54; Dkt. No. 182, Ex. 56).

On June 28, 2007, Shelton and Denby attended a meeting with Betty's divorce attorney and a forensic accountant in New Hampshire.  (Denby SMF ¶ 55).  The meeting lasted about three hours.  (*Id.*).  Following the meeting, Shelton sent an e-mail to Betty telling her that she thought the meeting had gone well and asking to be kept "posted on how things go on Monday." (*Id.*; Dkt. No. 182, Ex. 57).  Shelton testified (and both sides agree) that her e-mail referred to a divorce hearing that was set to take place the following Monday, July 2, 2007.  (Denby SMF ¶ 55; Shelton Dep. at 275).[7]

On August 20, 2007, Betty sent an e-mail to her brothers Sam and Steve in which she proposed dates for an in-person meeting involving the three of them, Shelton, and Denby.  (*Id.* ¶ 58; Dkt. No. 182, Ex. 61).  Sam responded with a list of dates on which he could meet, but Steve stated that he would prefer to participate by telephone.  (Denby SMF ¶ 58; Dkt. No. 182, Ex. 61; Dkt. No. 182, Ex. 62).  Betty forwarded Steve's e-mail to Shelton (but not Denby) and wrote: "what do you think we should do–he is resisting . . . should we let him know about issues on the agenda? that we want to talk about the implications of the divorce and a buy out? . . . that the red sox are an issue . . . they are trying to force my hand with the agenda."  (Dkt. No. 182, Ex. 62). Shelton responded by advising Betty not to respond to Steve's e-mail "for the moment."  (*Id.*). Shelton further advised Betty that a telephone meeting would be acceptable, but Betty was "adamantly opposed" to the idea.  (Shelton Dep. at 372).  Shelton testified that Betty "felt it was really important to get Steve there for some reason" and that Shelton "deferred to her desire."

---

[7] On July 2, 2007, Shelton sent an e-mail to Betty that read:  "good luck to you, Betty.  I will be thinking about you today too.  xoxox."  (Dkt. No. 182, Ex. 58).  As to her intent in writing the e-mail, Shelton testified:  "I mean, I can only imagine that it was related to the divorce, but . . . I really don't know."  (Shelton Dep. at 278). Twenty minutes later, Shelton sent another e-mail to Betty; that e-mail read, in part:  "I will call the potential malpractice lawyers later this week after I am coherant [sic] . . . We will get that organized."  (Dkt. No. 182, Ex. 59).

(*Id.*).

On August 29, 2007, Shelton sent a letter to Sam and Steve in which she introduced herself as the new trustee of the EMT Trusts and again attempted to schedule an in-person meeting.  (Denby SMF ¶ 60; Dkt. No. 182, Ex. 65).  She volunteered to travel from Chicago to New Hampshire in order to facilitate the meeting.  (Dkt. No. 182, Ex. 65).

According to Shelton, Denby wrote the original draft of the letter.  (Shelton Dep. at 396-97; Dkt. No. 182, Ex. 66).  She testified that the letter was written with an eye toward potential litigation, and that she attempted to "soften" it with her edits.  (Shelton Dep. at 397, 399).  The letter stated that "Betty ha[d] significant cash flow issues" and that the group "need[ed] to discuss projected cash flows as well as how to address her current cash needs."  (*Id.*).  The cash-flow issues to which she referred at that time were caused by expenditures related to Betty's pending divorce and home renovations.  (Shelton Dep. at 391-92).

Shelton knew that Betty was unable to meet her monthly obligations with the $22,000 monthly distribution she received from the trusts at that time.  (*Id.* at 392).  She testified that she did not consider herself Betty's lawyer at the time, but that she did consult with Betty and Denby as to possible strategies for increasing Betty's cash flow.  (*Id.* at 253).

In September and October of 2007, Betty wrote personal checks totaling more than $38,500, including one in the amount of $7,150 for a down payment on a family weekend retreat and $6,780 to Harvard University for her own tuition.  (Dkt. No. 182, Ex. 33; Trial Tr. at 1324-25, N.H. Litigation (Dec. 9, 2009)).  She also donated $20,000 to Georgetown University in that same time frame.  (Betty Dep. June 5, 2014 at 846-47).  Shelton was unaware at the time that Betty had made those expenditures.  (Shelton Dep. at 741).

F.      **The Hiring of Weisman & McIntyre**

At all times relevant to the complaint, Weisman & McIntyre, P.C. ("W&M") was a

professional corporation organized under the laws of Massachusetts.  (W&M SMF ¶ 1).  The two

members of W&M were defendants Michael D. Weisman and Rebecca ("Betsy") McIntyre.

(*Id.*).  Weisman owned two-thirds of the corporation's shares, and McIntyre owned the

remaining third.  (McIntyre SMF ¶ 1).

In August and early September 2007, Betty and Shelton interviewed at least three

litigation attorneys, including Michael Weisman and Al Zabin, with a view toward filing a

potential malpractice claim against Couser.  (Denby SMF ¶ 68; W&M SMF ¶ 21; Shelton Dep.

at 57-58, 65-66).  Shelton was the "point person" on the search.  (W&M SMF ¶ 21; Shelton Dep.

at 325).  She learned of Weisman through a recommendation from an attorney who in turn had

been recommended to her by Fran Fox, a former colleague.  (W&M SMF ¶ 21; Shelton Dep. at

57-58).  She had asked Fox for "the names of some lawyers in Boston that [they] could talk to

about a potential malpractice claim."  (Shelton Dep. at 57-58).  She asked for Boston lawyers

because Betty had "suggested that [they] wouldn't want a New Hampshire lawyer."  (*Id.* at 57).[8]

On August 24, 2007, Betty and Shelton met with Weisman at the offices of W&M.

(W&M SMF ¶ 22).[9]  Weisman told them that he and McIntyre, who was not present at the

meeting, were not experts in trust law or trust litigation.  (*Id.*; Shelton Dep. at 825-26).  The

---

[8] According to an e-mail Shelton sent to Betty and Denby, when Shelton asked Fox for his opinion on Weisman, he told her that he did not know Weisman personally, but "he said anyone who's in the American College of Trial Lawyers is going to be an excellent trial lawyer."  (Shelton Dep. at 404-05).  Shelton also testified that she spoke to Steinfeld and Zabin about Weisman and his experience.  (*Id.* at 90).  Through her inquiries, she came to understand that Weisman had been involved in "significant litigation in New Hampshire regarding some schools."  (*Id.* at 88).

[9] Shelton testified that she believed "Stephanie [Denby] was on the phone for part of [the meeting]."  (Shelton Dep. at 59).

primary subject of the meeting was a potential malpractice claim against Couser.  (W&M SMF ¶ 22; Shelton Dep. at 65-66).

At some point in the next few weeks, the idea of initiating litigation against not only Couser (for malpractice), but also potentially against Sam and Steve (for breach of fiduciary duty), arose.  (Betty Dep. at 634-36; Shelton Dep. at 66-67).  From that point on, the search for a litigation attorney was conducted with both possibilities in mind.  (Betty Dep. at 634-36; Shelton Dep. at 66-67).

On September 4, 2007, Shelton sent an e-mail to Betty and Denby updating them on the search for a litigation attorney.  (Denby SMF ¶ 84; Dkt. No. 182, Ex. 80, at 2-3).  In the e-mail, Shelton stated:  "I think we need to do the following asap: . . . Talk to [attorney] Zabin about the Red Sox angle and the goal of getting a buy out."  (Denby SMF ¶ 84; Dkt. No. 182, Ex. 80, at 3).

By September 19, 2007, discussions with Weisman had progressed substantially.  That day, Weisman sent a draft of a fee agreement to Shelton, who forwarded it along to Betty.  (Dkt. No. 182, Ex. 81).  The letter stated that W&M would provide representation in connection with two matters:  any legal malpractice or other claims against Couser and any claims against any "appropriate individual or entity for breach of fiduciary duty or other legal claims respecting the management of assets in which you have a direct or indirect ownership interest, including, but not limited to, your ownership interest in the Boston Red Sox."  (*Id.*).[10]  It also stated that W&M would be paid "one third (1/3rd) of the gross amounts of recovered by you in this matter as a

_____

[10] The letter is addressed to "[c]lient" and does not identify the client or clients by name at any point.  (Dkt. No. 182, Ex. 91).

result of settlement, judgment or otherwise." (*Id.*).[11]

Later that same day, Shelton sent an e-mail to Weisman about the proposed representation agreement with W&M. (Denby SMF ¶ 86; Dkt. No. 182, Ex. 82). That e-mail stated in part:

> I spoke with Betty last night and she is adament [sic] about having a fixed cap of fees of $200,000. She is willing to agree to payment of the contingent fee on the Red Sox whether or not you reach $200,000 in fees before resolving the Red Sox sale, but not on the buy out. (I think that is probably a moot point since it's likely we won't get a buy out without filing a lawsuit and getting to the brink of the brothers being removed as trustees.)

(Dkt. No. 182, Ex. 82).[12]

Betty and Shelton retained W&M on September 21, 2007. (W&M SMF ¶ 25; Crossclaims of Shelton Parties, ¶ 34; Weisman Dep. at 16-18). Betty signed a retainer agreement on September 22, 2007. (Dkt. No. 193, Ex. A, at 220-23).[13] The agreement was

---

[11] McIntyre was not involved in the negotiation of the fee agreement. (McIntyre SMF ¶ 27; McIntyre Dep. at 18).

[12] Before Betty and Shelton retained W&M, Weisman had at least one conversation with McIntyre in which she expressed some reservations about the arrangement. McIntyre testified as follows:

> A.   I recall [Weisman] telling me that he was interested in getting involved and I was very wary, and I told him that I thought if we took the case and we won we would have trouble collecting our fee and if we lost she would sue us for malpractice.
>
> Q.   "She" meaning Betty Tamposi?
>
> A.   Yes.
>
> Q.   And on what—on the basis of what information did you voice that opinion?
>
> A.   On the basis of the information I had at the time which was her track record. And the fact that she was there in part to explore suing her previous lawyer for malpractice.

(McIntyre Dep. at 17-18; McIntyre SMF ¶ 27).

[13] Shelton and Weisman did not formally execute an engagement letter until July 16, 2008. (Crossclaims of Shelton Parties, ¶ 34; Dkt. No. 53, Ex. 2). That letter stated, in part: "This will confirm that the terms on which this firm has represented and shall continue to represent you as trustee of the [EMT Trusts] shall be as set forth in my letter to Betty dated September 21, 2007." (Dkt. No. 53, Ex. 2). Weisman testified that it was an "oversight" on his

written and signed by Weisman, and stated in part:

> I will be the lawyer principally responsible for this representation, although I may assign projects relating to the case to other lawyers or other personnel at W&M under my supervision.  I will continue to be responsible to you for the entire assignment, however, and will be available to discuss the use of other personnel with you.

(*Id.* at 220).

Betty and Shelton were the decision-makers in the determination to retain W&M, and they are the ones who negotiated the fee arrangement with Weisman.  (Denby SMF ¶¶ 69, 87; Shelton Dep. at 531-32).

As of the time that Betty and Shelton retained W&M, McIntyre had never served as lead counsel in a trial.  (McIntyre SMF ¶ 2).  She and Weisman had tried several cases together, but Weisman had always served as lead counsel and McIntyre had always been the "second chair." (*Id.*).

### G.    Betty and Shelton's Direct Requests for Additional Funds

At some point in approximately September 2007, Betty asked her mother Barbara and her brother Nick for a loan.  (Betty Dep. at 696).  Nick provided her with a loan, but her mother declined, apparently on the advice of Sam.  Betty, Shelton, and Denby all testified that Sam told Barbara that she should not provide Betty with any money, because there was "a huge backlog of funds" in the EMT Trusts.  (*Id.*; Shelton Dep. at 426; Denby Dep. at 249-50).

On September 7, 2007, Betty's bookkeeper Sue Edwards sent Shelton and Denby documents related to tuition payments for Betty's children Maggie and John.  (Denby SMF ¶ 62; Dkt. No. 182, Ex. 67).  The documents had previously been sent by fax to the Tamposi

---

part not to have Shelton sign an engagement letter until July 2008, and that he considered himself to be representing her in her capacity as trustee as of September 21, 2007.  (Weisman Dep. at 18, 153-54).

Companies for payment.  (Denby SMF ¶ 62; Dkt. No. 182, Ex. 67).  Betty had been attempting to get Sam and Steve to pay the tuition for Maggie and John.  (Denby SMF ¶ 62).  She told Shelton "at some point, around [that] time" that Sam was not cooperating with the request for tuition payments.  (Shelton Dep. at 441).[14]

In early September 2007, Betty, Shelton, and Denby held a conference call in which they discussed options for increasing Betty's cash flow.  (Denby SMF ¶ 64; Shelton Dep. at 441). During the call, they agreed to request a $1.5 million cash distribution from Sam and Steve. (Shelton Dep. at 441).  Shelton prepared a draft of a letter to be sent by her to Sam and Steve. The initial draft stated, in part:  "I have determined that Betty is in immediate need of $1.5 million in order to maintain her health and reasonable comfort."  (Dkt. No. 182, Ex. 68).

Shelton circulated the draft of the letter to Betty and Denby on September 7, 2007.  (Dkt. No. 182, Exs. 68-69).  Betty responded to Shelton and Denby later that day and wrote:  "Let's round the number up to $1.8 million."  (Dkt. No. 182, Ex. 69, at 5).  She attached a spreadsheet entitled "Betty Bills Owed" that purported to outline her financial obligations, which totaled $1,781,238.07.  (Denby SMF ¶ 65; Dkt. No. 182, Ex. 69, at 4).  Denby responded and wrote: "As you are already at $1.7, do you ask for $2 million."  (Denby SMF ¶ 65; Dkt. No. 182, Ex. 69, at 5).  Betty then wrote back and agreed that they should ask for $2 million.  (Denby SMF ¶ 65; Dkt. No. 182, Ex. 69, at 5).[15]

Later that day, on September 7, 2007, Shelton mailed the final draft of the letter to Sam

---

[14] Historically, Betty's mother Barbara had "often" paid tuition for her grandchildren, but she had ceased to do so for the children of Betty and Nick in 2003, due to their conflicts with Sam and Steve.  (Betty Dep. at 844-85).

[15] Betty testified that asking for $2 million "was an idea that evolved from conversations between Ms. Shelton, Ms. Denby, myself, and Mr. Weisman."  (Betty Dep. at 83).

and Steve via FedEx.  (Dkt. No. 182, Ex. 69, at 2; Denby SMF ¶ 67).  The letter stated in part:

> As you know, the Trusts provide for the trustee to pay to the beneficiaries such amounts from the income and principal as the trustee considers necessary for the beneficiary's maintenance in health and reasonable comfort.  I have determined due to insufficient cash flow over the past few years as well as some extraordinary expenses, Betty needs an additional distribution in the amount of $2 million to pay off these accumulated debts. . . . As you are probably aware, because of her financial distress, Betty has been forced to seek loans from family members, including your mother, Barbara Tamposi.  Barbara declined to assist Betty based on your representation to her that there was a "huge backlog of funds" Betty could access from the trusts.  Accordingly, I would ask that you please arrange to transfer funds from that "backlog" in the amount of $2 million into Betty's 1992 subtrust within the next seven days.  If you are unable or unwilling to transfer these funds, please provide me with a full explanation of your reasons for not doing so.

(*Id.*).  Sheldon intended the letter not only to obtain cash to help Betty pay her bills, but also to initiate a dialogue with Sam and Steve.  (Shelton Dep. at 348).

On September 13, 2007, attorney Robert Stein, acting as counsel for Sam and Steve in the role as investment directors, sent a letter to Shelton in response.  (Denby SMF ¶ 71; Dkt. No. 182, Ex. 71).  The letter stated in part:

> I think you have the cart before the horse.  I confirmed with [counsel for Prunier,] David Barradale[,] today that the settlement documents have not been signed, nor has the release been signed by your client and her extended family.  Unless or until the documents are finalized, the appropriate releases signed, and appropriate allocations made, I believe the proposed meeting between you, Sam and Steve, and the proposed distribution to Betty Tamposi, are premature.

(Denby SMF ¶ 71; Dkt. No. 182, Ex. 71).

Upon receiving the letter from Stein, Shelton forwarded it to Denby, Betty, and Weisman.  (Denby SMF Denby ¶ 72; Shelton Dep. at 479).  Shelton wrote an initial draft of a response, and Denby and Weisman provided edits.  (Denby SMF ¶ 72;  Dkt. No. 182, Ex. 72; Shelton Dep. at 492-93).  Among other things, the response expressed a continuing desire by

Betty and Shelton to arrange a meeting with Sam and Steve.  (Denby SMF ¶ 72; Dkt. No. 182,

Ex. 72).  Shelton appears to have sent a final version of the letter to Stein by fax on September

14, 2007.  (Denby SMF ¶ 74; Dkt. No. 182, Ex. 74).

On September 18, 2007, Betty sent an e-mail to Shelton that stated, in full:  "Jules,

okay . . .  now we need to whack really really hard to get their attention. Betty."  (Dkt. No. 182,

Ex. 86).  In response, Shelton wrote:  "So we file the complaint Weisman is drafting.  He will

have a draft to us later today."  (Denby SMF ¶ 92; Dkt. No. 182, Ex. 86).  Denby was not

included in that e-mail exchange.  (Denby SMF ¶ 92; Dkt. No. 182, Ex. 86).

On September 19, 2007, Sam wrote to Sue Edwards (Betty's bookkeeper) by fax and

informed her that his mother Barbara would "not pay for John and [Maggie]'s tuition until all

matters are formally resolved and signed relating to the Tamposi sibling settlement.  [F]or

example underlined releases signed by Betty and her adult children, etc."  (Denby SMF ¶ 73; Dkt. No. 182,

Ex. 73) (emphasis in original).  Shelton received a copy of the fax message on September 20,

2007.  ((Denby SMF ¶ 73; Shelton Dep. at 535-36).  As to her interpretation of Sam's use of the

word "releases," she testified:  "I thought he was talking about releases for any actions that were

taken by the investment directors between the time of the settlement agreement in 2006 and the

present."  (Shelton Dep. at 536).  She felt that the letter was "at least certainly concerning,

warranting concern" in that it indicated that Sam and Steve were not attempting to cooperate

with Betty or with her as Betty's trustee.  (*Id.* at 536-37).

On September 20, 2007, attorney Stein sent another letter to Shelton.  (Denby SMF ¶ 74;

Dkt. No. 182, Ex. 74).  That letter stated in part:

> Things have certainly not gotten off to a good start in the transition from Dick
> Couser to you. . . . First, the meeting on September 20 is simply not going to

happen.  In addition to the issues already raised in our letters, Steve took a very
bad fall the other day and is not able to get on a plane due to spine and tailbone
injuries.  Moreover, there is nothing that requires him to attend a face-to-face
meeting in Nashua at a time selected by you.  His responsibilities can be fulfilled
via conference call, a teleconference, or by you visiting the lovely State of
Florida.  Sam and Steve are willing to work towards meeting with you, but as I
indicated in my earlier correspondence, you have the cart before the horse.

(Denby SMF ¶ 74; Dkt. No. 182, Ex. 74).

On that same day, Betty sent an e-mail to Shelton and Denby in which she described a

conversation she had had earlier that day with her mother Barbara about Sam's and Steve's

desire for her to sign a release.  (Denby SMF ¶ 75; Dkt. No. 182, Ex. 75).  She concluded the e-

mail with the following language:  "looking forward to getting a plan together and by a stroke of

unbelivavble [sic] luck get a buy out."  (Denby SMF ¶ 75; Dkt. No. 182, Ex. 75).

On September 26, 2007, Weisman sent a letter to an attorney for Barbara Tamposi

proposing that Sam and Steve buy out the EMT Trusts for $24,269,406.78.  (Denby SMF ¶¶ 76,

88, Dkt. No. 182, Ex. 76).  Based on what she knew at the time, Shelton approved of Weisman's

sending the letter, although she is not sure if she gave her approval in advance of his sending it.

(Shelton Dep. at 576-77).

### H.    The Filing of the Massachusetts and New Hampshire Lawsuits

By September 2007, Betty and Shelton had begun to discuss the possibility of litigation

against Sam and Steve.  According to Shelton, Denby, Weisman, and McIntyre, the group had at

least one discussion in which they reviewed their legal options.  (Denby SMF ¶ 94).  One of

those options was to file a petition for instructions rather than a lawsuit.  (*Id.*).[16]  According to

---

[16] Asked what Denby's advice regarding a petition for instructions was, Shelton testified:  "I don't think I
was relying only on Stephanie [Denby] at that point because the trial lawyers were also involved in the discussion.
Well, I shouldn't say the trial lawyers because it was only Michael [Weisman] at that point."  (Shelton Dep. at 112).

Shelton, Betty was "adamantly opposed" to that option, both because it "wouldn't solve . . . [t]he problem that she always had to be dependent on [Sam and Steve] in some way or another for her well-being" and because "it wouldn't have involved the [Gifted A]ssets."  (Shelton Dep. at 101, 102, 555, 649).  Largely due to Betty's reaction to that idea, the group decided to file two lawsuits alleging breach of fiduciary duty:  one in the New Hampshire Probate Court and one in the Massachusetts Superior Court as to the Red Sox option.  (Denby SMF ¶¶ 94-97).[17]

In connection with the anticipated litigation in New Hampshire, and on Weisman's recommendation, Betty and Shelton hired Steve Gordon and Arpiar (Arpie) Saunders of Shaheen & Gordon, P.A. as New Hampshire local counsel.  (Denby SMF ¶ 78; Shelton Dep. at 609-10, 827-28).  Shelton understood at that time that Saunders had more experience with probate litigation, and in New Hampshire courts, than did Weisman.  (Shelton Dep. at 826-28).

In preparing for litigation, Denby reviewed a number of materials, including all of the trust documents; Judge Cloutier's decision from October 2000; some of the filings from that litigation; and some research into the application of the *in terrorem* clause that had previously been performed by Couser.  (Denby Dep. at 29, 40-42, 65).  She also testified:  "I reviewed the UTC [Uniform Trust Code].  I reviewed the New Hampshire [C]ode.  I looked at 'Scotts on Trust.'  I looked at 'Bog[e]rt on Trust' to look and see what issues were relevant to New Hampshire and other issues and [the] *in terrorem* clause."  (*Id.* at 67-68).[18]

---

[17] Shelton testified that the relief Betty was "[u]ltimately" seeking was a buyout.  (Shelton Dep. at 649-50).

[18] Denby's testimony appears to refer to particular editions of Austin Wakeman Scott, Mark L. Ascher, & William Franklin Fratcher, Scott and Ascher on Trusts and George G. Bogert & Amy Morris Hess, Bogert's Trusts and Trustees.  Denby also testified that she read and "updated" the New Hampshire case of *Burtman v. Butman*, 94 N.H. 412, 54 A.2d 367 (1947), even though "[i]t was not a trust case," in part because there was "not much in New Hampshire on the *in terrorem* clause validity."  (Denby Dep. at 57-58).

According to W&M's billing records, Weisman began to work on a complaint for Betty and Shelton on September 16, 2007.  (Dkt. No. 193, Ex. 5, at 56).  McIntyre began doing so on September 23, 2007.  (*Id.* at 57).  Weisman continued to work on one or both complaints through at least September 28, 2007.  (*Id.* at 56-57).

On September 22, 2007, the W&M office prepared a memorandum that purported to provide summaries of seven New Hampshire cases and two New Hampshire statutes.  (Dkt. No. 182, Ex. 85).  The document was distributed to Denby shortly thereafter.  (Denby Dep. at 83).

On September 25, 2007, McIntyre circulated a draft of the New Hampshire complaint to Betty, Denby, Shelton, and Weisman.  (Denby SMF ¶ 79; Dkt. No. 182, Ex. 77).  McIntyre testified that the information in the first draft of that complaint had been provided to her by Weisman, and that she thought at least some of it had originally come from Betty and Denby. (McIntyre Dep. at 22-23, 28-29).[19]

Denby testified that "everybody" was involved in the discussions that led to the drafting of the complaint, including Shelton.  (Denby Dep. at 166-67, 445-46).[20]  She further testified:

> Q.      And is that the first time you had occasion to think about the remedies that would be sought in New Hampshire when you saw what Betsy had drafted?
>
> A.      No.  I think that there were discussions regarding remedies prior to drafting of the complaint.

---

[19] When asked whether McIntyre wrote the first draft of the complaint herself, Weisman testified:  "Yes, and I should be clear.  She circulated it, she sent it to me, and I would expect that I would have approved it before it went out."  (Weisman Dep. at 66).

[20] When asked who drafted the New Hampshire complaint, Betty testified:  "I know Stephanie had a hand in drafting it, in all likelihood Mr. Weisman had a hand in it, Ms. Shelton.  We all were working on it together."  (Betty Dep. at 101).  She further testified that she communicated with both Weisman and Denby in reviewing drafts of the complaint from September 25 through October 10, 2007.  (*Id.* at 744).  She also testified that she "probably" communicated with Shelton about them, but that she could not remember whether she spoke to McIntyre about them. (*Id.*).

Q.      And were you involved in those discussions?

A.      Yes.

Q.      And did you—is it fair to say you rendered advice as to what remedies
        should be sought?

A.      I explained options as to what remedies would be sought—could be
        sought as to what were appropriate remedies that you could seek in breach
        of fiduciary duty cases, but Betty was the person who was electing which
        remedies she wanted to pursue.  She was very strong-minded about that.

(Denby Dep. at 166).

The New Hampshire complaint was edited to at least some degree by McIntyre, Denby,

Weisman, Shelton, Gordon, and Saunders.  (Denby SMF ¶ 79; Weisman Dep. at 69-76).  Denby

testified that she made "revisions to the prayers for relief."  Specifically, she testified as follows:

I think the original prayer for relief asks that Gerald Prunier be removed as
trustee.  I think I added, "Remove Sam and Stephen as directors of the Tamposi
Companies."  And I think that I added E, "Other.  Order the liquidation of the
Tamposi Companies."

(Denby Dep. at 443).[21]

On September 28, 2007, Betty and Shelton filed a complaint in Massachusetts Superior

---

[21] Denby testified that she discussed the draft complaint with McIntyre:

Q.      What do you recall of those discussions?
. . .

A.      . . . Betsy McIntyre and I rarely spoke together alone.  It was in a team conversation.

Q.      What conversations did you have with Betsy McIntyre about the contents of the
        complaint . . . ?

A.      Again, I believe I was sending back and forth drafts.  There was e-mail correspondence
        going between us and I believe that the discussions that Betsy and I had were
        either—were with Michael.  So, usually Michael was usually involved—and Julie and
        Betty probably.

(Denby Dep. at 445-46).

Court against Tamposi LLC, Ballinger Properties LLC, Sam, and Steve.  (Denby SMF ¶ 77; Dkt. No. 182, Ex. 27; *Julie Shelton, Trustee, et al. v. Tamposi LLC et al.*, Suffolk Superior Court Civil Action No. 07-4283, September 28, 2007).  It alleged a breach of fiduciary duty and sought, among other things, an order compelling the respondents to exercise the Put Option for sale of the shares of Tamposi LLC owned by the EMT Trusts.  (Mass. Compl. at 12-16).[22]  The complaint was signed by McIntyre.  (McIntyre Dep. at 41).  Betty testified that the goal of the lawsuit was to try and force the liquidation of the Boston Red Sox asset so that she could obtain some quick cash.  (Denby SMF ¶ 77;  Betty Dep. at 591-92).

On October 1, 2007, Shelton sent an e-mail to McIntyre, Denby, and Betty in which she asked McIntyre to make sure she incorporated some particular changes that had been made by Denby into the New Hampshire complaint.  (McIntyre SMF ¶ 40; Shelton Dep. at 92-94).  On October 5, Denby circulated a new draft that incorporated her and Gordon's changes.  (W&M SMF ¶ 31; Dkt. No. 193, Ex. 2, at 406).  Later that day, Shelton e-mailed Denby and wrote: "Yes.  Otherwise, I think the complaint looks great."  (Shelton Dep. at 612).  On October 8, Denby and Shelton exchanged e-mails about the draft.  (Dkt. No. 193, Ex. 2, at 406).

Shelton agreed at her deposition that she "engaged in multiple long discussions with Stephanie and Michael Weisman and Betty concerning whether or not the lawsuit should be filed" and that she ultimately approved of its filing.  (Shelton Dep. at 92-93, 506).[23]  However,

---

[22] According to Denby, the last year the Put Option was exercisable on Betty's behalf was 2008.  (Denby SMF ¶ 77;  Denby Dep. at 157).

[23] At her deposition, Shelton testified as follows:

Q.   And you came to your own determination, did you not, that you felt that it was weighing the pros and cons of whether or not litigation should proceed, you came to the conclusion, based on the advice and information that you had, that it was the appropriate thing to do, file the Massachusetts case and file the New Hampshire case, correct?

she also testified that she was only "minimally" involved in the editing process overall and that she approved the complaint upon "relying on the advice of [her] counsel."  (Shelton Dep. at 92-93, 504).  More specifically, she testified:

> . . . I was not a member of the team in the same way that the rest of them were.  I offered some stylistic suggestions and answered maybe some specific questions that they directed at me, but I was not involved in formulating any of the legal theories or articulating any of the legal theories at any time.

(Shelton Dep. at 615-16).[24]

On October 9, 2007, Gordon e-mailed a proposed "final" draft of the New Hampshire complaint for review and requested approval to file it.  (W&M SMF ¶ 31).  Denby responded that Weisman and McIntyre were occupied with a trial in a different case, but that Betty, Shelton, and Weisman had all signed off on the last draft and that Gordon could therefore proceed to file it.  (*Id.*; Shelton Dep. at 619-20).

On October 12, 2007, Betty and Shelton (in her capacity as trustee) filed the complaint in Hillsborough County Probate Court in New Hampshire.  The complaint alleged breaches of fiduciary duty by Sam and Steve.  (Denby SMF ¶ 80; Dkt. No. 182, Ex. 1); Complaint, *Shelton v. Tamposi*, No. 316-2007-EQ-2109 (N.H. Probate Ct. October 12, 2007).  The alleged breaches of fiduciary duty included the failure to address Betty's "immediate and pressing cash needs," Sam's misappropriation of the benefits associated with ownership of the Red Sox, and economic coercion.  (N.H. Compl. at 4, 8, 10).  The complaint requested the following relief:

---

A.      Yes.

(Shelton Dep. at 557).

[24] Asked whether her attorneys solicited her input "at least with respect to certain paragraphs of the complaint," Shelton testified:  "I think my input was welcomed.  I don't know if I was specifically asked.  I can't remember that."  (Shelton Dep. at 612-13).

A.      Order [d]efendants to provide [p]laintiffs with a formal accounting or [i]nvestment [d]irectors' report from November 13, 2006 to the present;

B.      Surcharge [d]efendants for all losses to the EMT Trusts caused by [d]efendants' breaches of their fiduciary duties to [p]laintiffs;

C.      Remove Samuel and Steve as [i]nvestment [d]irectors of the EMT Trusts;

D.      Remove Samuel and Steve as [d]irectors of the Tamposi Companies;

E.      Order the liquidation of the Tamposi Companies so that the assets can effectively be managed for the benefit of Elizabeth and her children as intended by her father when he created the EMT Trusts;

F.      Enjoin [d]efendants from charging Elizabeth or the EMT Trusts any additional fees or attorney fees in conjunction with their seeking judicial relief;

G.      Award [p]laintiffs their attorneys' fees and costs in this action, and any other costs caused by the actions of [d]efendants; and

H.      Grant such other and further relief as this Court deems just and proper.

(N.H. Compl. at 14-15).

When asked about the risk that the request in the New Hampshire complaint for an order liquidating the Tamposi Companies could trigger the *in terrorem* clause, Shelton testified as follows:

Q.      And I know this wasn't your main area of litigation expertise, but did you have a thought that, "Gee, that might actually—by seeking dissolution of the underlying companies, which was set up by the father in the way he set it up in the trust documents, isn't it possible that we're flying into the teeth of the *in terrorem* clause?"  Did you have any thought like that before letting this complaint get filed in New Hampshire?

A.      No.  I didn't have any thought like that.  I didn't understand the structure of the Tamposi companies.  I didn't understand what the assets that were held in the trust very clearly.  And I understood this as something Stephanie and Betty had discussed and felt it was important to the—to the cause of action.

Q.     So is it fair to say that—and don't let me put words in your mouth.  I'm really asking you, is it fair to say that you relied on what Stephanie and Betty wanted in not looking into whether or not seeking dissolution of the Tamposi companies would be a big problem for the *in terrorem* clause?

. . .

A.     I had a conversation many times at the beginning of this whole saga with Stephanie, with Betty, with Michael, saying, "Stephanie has all the files.  She has Couser's whole file.  She has all the prior trust stuff.  I'm not going to look at that again.  I'm not going to duplicate the efforts that she's made.  I'm not going to look at it.  So I'm not going to have that information.  So I want you all to know I don't have it, and I'm relying on Stephanie and Betty for that information."  And so did I have the ability at that point to understand that this might have been something that someone down the line would consider a violation of the *in terrorem* clause?  No.

(Shelton Dep. at 99-101).  When later asked if she was warned by counsel of such a risk, she

testified:

Q.     Would you agree that in the discussions that took place prior to the filing of the New Hampshire litigation, I think the words you used was that the lawsuit that was being filed by bringing a breach of fiduciary duty claim minimized the risk of enforcement of the *in terrorem* clause.  Is that the advice that you believe you recollect receiving from Stephanie Denby and Michael Weisman?

A.     I would say that's accurate.

Q.     They didn't say that there wasn't any risk, did they?

A.     No.

Q.     And in fact, isn't it correct that prior to the filing of the New Hampshire probate case, Stephanie Denby then, in fact, advised you and advised Betty in conversations that took place that there was a risk that the *in terrorem* clause could be enforced against Betty?

A.     Yes.

Q.     And Michael Weisman also advised you and Betty of that risk, correct?

A.     I think Michael – I would say yes.  I would say yes.

(*Id.* at 201-02).[25]

 She also testified as follows as to the state of her knowledge on October 12, 2007, the

date that the New Hampshire complaint was filed:

> Q. As of October 12th, 2007, were you aware of the fact that a plaintiff who
> brings an action and has been held to have acted in bad faith in bringing
> that action could be held liable for the other side's attorneys' fees?  It's a
> yes-or-no question.
>
> A. Theoretically, yes.
> . . .
>
> Q. You did know, as of October of 2007, that there was a common law
> exception justifying the award of fees when a [c]ourt determined that a
> party had acted in bad faith, right?
> . . .
>
> A. I would say, yes.
> . . .
>
> Q. You knew about the bad faith exception to the American rule that each
> side bears its own fees.  You knew of that exception before you filed this
> probate court complaint, correct?
>
> A. Generally, yes.

(*Id.* at 708-09, 788-89, 817).

 On October 22, 2007, Shelton sent an e-mail to Betty and Weisman in which she stated,

among other things:  "Michael, . . . Betty is looking for reassurance that you are going to lead the

litigation and that you have a clear understanding of the facts and the strengths and weaknesses

of her claims."  (McIntyre SMF ¶ 52; Shelton Dep. at 658).  In that same e-mail, Shelton wrote:

---

[25] At her deposition, Shelton also agreed with the statement that the risk that the *in terrorem* clause might be
enforced was "one reason why Stephanie and the other members of the legal team were trying to get Judge Cloutier
as the judge" in the New Hampshire litigation.  (Shelton Dep. at 648).  Judge Cloutier had ruled in October 2000 that
seeking to uphold fiduciary standards under the trust would not violate the *in terrorem* clause as long as they did
"not challenge or attempt to challenge the validity of the trust or the authenticity of the [trust] documents or
signatures."  (Denby SMF ¶ 20; Dkt. No. 182, Ex. 19).

"I do not need to participate and would just like to be updated in case there's something I need to know as trustee."  (Shelton Dep. at 127).[26]  At her deposition in this action, she testified about that e-mail as follows:

> Q.    I don't want this question to come out as sarcastic, but how would you know what you needed to know as trustee in connection with the litigation?  How would you learn that?
>
> A.    Well, I would expect my lawyers to let me know.
>
> Q.    And who were the lawyers you would have expected to let you know at that time?
>
> A.    Stephanie and Michael.
>
> Q.    What about Rebecca?
>
> A.    Betsy wasn't really very involved at this point.

(Shelton Dep. at 127-28).

On November 6, 2007, Shelton and Denby executed a formal engagement letter under which Denby and Burke, Warren agreed to provide Shelton with "services in advising you on Trust Administration matters for the [EMT] trusts."  (Denby-Shelton Engagement Letter at 1).  The engagement letter addressed services provided to Shelton individually, in her role as trustee; Butler Rubin was not named as the trustee nor mentioned in the letter in any other capacity.  (Denby SMF II ¶ 4).[27]

On January 2, 2008, Sam and Steve responded to the New Hampshire complaint with

---

[26] The e-mail was apparently marked as exhibit 76 at Shelton's deposition, but that exhibit does not appear to be in the record.  (Shelton Dep. at 657).  The excerpts quoted above are as they were read into the record at Shelton's deposition.  (*Id.* at 127, 658).

[27] Shelton did not execute a new engagement letter when she joined Baker Daniels in 2008.  (Denby SMF ¶ 4).

thirteen separate motions.  (Denby SMF ¶ 101; Dkt. No. 182, Ex. 91).  One of those motions

sought an order that Betty had forfeited her beneficial interests in the EMT Trusts.  (Denby SMF

¶ 101; Dkt. No. 182, Ex. 91).[28]

On July 8, 2008, Shelton testified at a deposition in the Massachusetts litigation.  In

response to a question about Sam and Steve, she stated:  "I have no basis to claim that they have

mismanaged assets."  (Shelton Dep., Mass. Litigation (July 8, 2008) at 148-49; Dkt. No. 182, Ex.

89, at 148-49).

On August 4, 2008, Denby sent a letter to both Betty and Shelton "formaliz[ing their]

agreement that [Burke, Warren] represent[ed] Julie Shelton in her capacity as [t]rustee of the

[EMT Trusts] and Elizabeth M. Tamposi, both individually, and as beneficiary of the [EMT]

Trusts."  (Waiver of Conflicts at 1).  The letter stated in part:

> Such dual representation could result in a potential conflict of interest. . . . By this
> Agreement you each agree to full disclosure and candor in our discussions with
> one another. . . . It is possible that serious differences of opinion or disagreements
> might arise between the two of you in the course of our representation, and in that
> event considerations of legal ethics might compel us to cease representing both of
> you. . . . Please acknowledge your consent to our dual representation by signing
> the counterpart of the enclosed letter and returning it to me.

(*Id.* at 1-2).  Shelton signed the letter directly below a statement that read (in all capital letters):

"I consent to the representation of both Elizabeth M. Tamposi and me in my capacity as trustee

by Burke, Warren, MacKay & Serritella, P.C. in accordance with the foregoing."  (*Id.* at 2).

On September 11, 2008, Sam and Steve filed an answer in the New Hampshire

proceeding.  (Dube Aff., Ex. 32).  Among other things, the answer requested an award of

"attorney's fees, experts' fees, and costs for the defense of th[e] action and the defense of all

---

[28] Some time after the filing of the New Hampshire complaint, Michael Tamposi, Sally Tamposi, and
Gerald Prunier intervened on the side of the respondents.  (Denby SMF ¶ 102).

actual and/or threatened litigation before November 13, 2006." (Answer, N.H. Litigation, at 10).

The New Hampshire proceeding was assigned to Probate Court Judge Gary Cassavechia. On November 6, 2008, and November 14, 2008, Judge Cassavechia held a hearing on several pending motions. Order at 6-7, *Shelton v. Tamposi*, No. 316-2000-EQ-00178 (N.H. Probate Court Dec. 3, 2008).

On December 3, 2008, the court issued an order on the motions. (Denby SMF ¶ 103; Dkt. No. 182, Ex. 92). The order stated in part:

> The respondents have raised very serious issues in their defense of the requests for funds and payment of attorney's fees, including: the fitness of Julie Shelton as trustee; whether the trustee is merely acting as agent for one, or primarily for one, of the beneficiaries; whether this litigation will only benefit, or predominantly benefit, one beneficiary; and whether all beneficiaries have been and are adequately represented.
>
> . . .
>
> The court has also heard testimony, including testimony from the trustee herself, that she is not an expert in trust law and has had no prior experience in trust administration. It has equitable power to surcharge the trustee if there is a later determination that she has acted improperly in the prosecution of this litigation or in making disbursements.

Order at 6-7, *Shelton v. Tamposi*, No. 316-2000-EQ-00178 (N.H. Probate Court Dec. 3, 2008); (Denby SMF ¶ 103; Dkt. No. 182, Ex. 92).

Shelton testified as follows about the order:

Q.      After having read th[e order], did you understand that you could be personally surcharged?

A.      I did not understand that I could be personally surcharged.

Q.      What did you think "surcharge the trustee" meant?

A.      Well, I was—I didn't know what it meant in this context. I talked to my lawyers about it and was reassured that, "There's nothing improper going

on.  So this isn't something you need to be concerned about."

. . .

Q.      [Y]ou understood, didn't you, that the risk was that if the judge found that
        you had acted improperly, you could be held personally responsib[le],
        right?

A.      I didn't really understand the breadth of it.  I didn't really understand that
        I could have to pay Stephanie back—or, have to pay back all the fees that
        I had paid to Stephanie[,] all the fees I had paid to Michael, all the
        mortgage payments that had been made to Betty.  I mean, I really—I did
        not have a clear understanding of that at all.

Q.      So you didn't understand what could be encompassed within a surcharge?

A.      I didn't understand what could be encompassed within a surcharge.  I
        didn't understand—I really didn't understand very much about it. . . . And
        I didn't have any reason to believe that my interests at that point were
        diverging from the interests of the beneficiaries in pursuing the litigation.

(Shelton Dep. at 683, 924-25).[29]

Asked why she chose not to resign after the December 3, 2008 order, Shelton testified:

A.      Well, neither of my counsel advised me that I should consider resigning.
        Neither of my counsel advised me that perhaps I needed to consult counsel
        who was just interested in my welfare and not also Betty's.  My counsel
        were very reassuring about the fact that a surcharge was not going to
        happen because everything was appropriate and proper.  Had I known that
        they were not considering my interests as much as the interests of the case
        in general and maybe their own interests, Betty's interests, I would have
        probably done something differently.

Q.      And is it your testimony that if, in October of 2007, Mike or Betsy or
        Stephanie had advised you that there was a theoretical possibility of
        personal liability, but that no trustee had ever been found personally liable

---

[29] Shelton gave somewhat inconsistent testimony later in her deposition:

Q.      You knew when that order came out that the judge had the power to surcharge you personally,
        correct?

A.      I learned it, yes, when that order came out.

(Shelton Dep. at 923).

> for attorneys' fees under the circumstances of the case you were about to
> file, it's your testimony that you still would have withdrawn?

> A.      You know, I don't know exactly what I would have done, but I would have
> been able to make the decision with full knowledge of the risks that were
> confronting me.   And since I didn't have that full knowledge, I wasn't able
> to do that.

(*Id.* at 816-17).

On December 23, 2008, Betty and Shelton filed a motion for partial summary judgment

in which they asked the court to rule that their initiating the New Hampshire litigation would not

trigger the *in terrorem* clause of the 1992 Trust.  (Denby SMF ¶ 104; Dkt. No. 182, Ex. 93).

Shelton's records reflect that she billed 54.5 hours for services rendered as trustee of the

EMT Trusts in the month of January 2009.  (Dkt. No. 193, Ex. 2, at 294-95).  Those services

included at least three litigation strategy meetings that included McIntyre, among others.  (*Id.*).

On February 12, 2009, a hearing was held on Betty and Shelton's motion for partial

summary judgment in the New Hampshire litigation.  (Denby SMF ¶ 106; Dkt. No. 182, Ex. 95).

During attorney Weisman's argument at the hearing, Judge Cassavechia stated:

> So if I—if you roll the dice here.  I mean, just to get my arms around this.  And I
> say the investment advisors have not breached their duty, now you—at that point
> you're in violation of the *in terrorem* clause. . . . So if I find it wasn't in good
> faith, and without probable cause, the *in terrorem* clause . . . If I find as Mr. Stein
> or these other people have argued, that this is all about busting the trust, getting
> the cash—you know, if that's ultimately what happens, and I find that it was
> therefore not in good faith, there—it cost the trust money, and there really from
> the get go, I don't think there was a probable basis to believe it.  At that point,
> your client would be out.

(Tr. of Feb. 12, 2009 Hearing in N.H. Litigation, at 106-07).  Both Betty and Weisman were

present at the hearing; Shelton was not.  (Denby SMF ¶ 106; Resp. to Denby ¶ 106).

After the hearing on the motion for partial summary judgment, Betty expressed concerns

to Denby, Weisman, and Shelton about "[t]he fact that the judge was questioning one of the prayers for relief."  (Betty Dep. at 797-99).  As a result of those concerns, a decision was made to draft an amended complaint.  (Weisman Dep. at 261-62).[30]  On February 16, 2009, Weisman began working on a draft.  (Dkt. No. 193, Ex. E, at 126).

On February 17, 2009, Denby wrote an e-mail to Weisman that stated in part:

> Betty remains very concerned with what happen [sic] at the last hearing with regards to the in terrorem.  From her position a buy out is the only way to get free from the brothers.  She has deep concern that the ruling might come out and block us for the relief that we need.  So we discussed trying to file a supplemental response on this issue before the ruling comes out.  We are in fact looking for a buy out of Betty.  To the extent that we represented that we are not looking for a buyout, we need to correct this.

(Dkt. No. 182, Ex. 96).  Denby also sent the e-mail to Betty, Shelton, and McIntyre.  (*Id.*).

Weisman performed additional work on the amended complaint in late February and early March 2009.  (Dkt. No. 193, Ex. 5, at 127, 129).  The billing records do not indicate that McIntyre spent any time working on it.  (*Id.* at 125-27, 129).  Asked whether she had "some involvement" in the preparation of the amended complaint, she testified:  "I believe I did.  But mostly in the role of scribe."  (McIntyre Dep. at 62-63).[31]

---

[30] Weisman testified:  "Ultimately, what—the decision made in consultation with Stephanie Denby, Julie Shelton as an—and Betty Tamposi was the—and Betsy McIntyre was the amended complaint; and in those discussions—so the result was the amended complaint."  (Weisman Dep. at 261-62).

[31] Asked whether anyone else at W&M worked on the amended complaint, Weisman testified:

A.    Well, Betsy's doing legal research on New Hampshire law; and that may relate to the amended complaint as well.

Q.    It's correct, though, that you were the person who actually did the drafting of the amended complaint at Weisman & McIntyre?

A.    My time records indicate that I'm working on the amended complaint, and my expectation is that Betsy would have also been involved in drafting the amended complaint given our ordinary division of labor.

On March 2, 2009, Betty and Shelton filed an amended complaint in the New Hampshire litigation.  (Denby SMF ¶ 108; Dkt. No. 182, Ex. 97).  The prayers for relief in the amended complaint were the result of discussion among Betty, Shelton, Denby, Weisman, and "probably" McIntyre, according to Denby.  (Denby Dep. at 173).  Among other things, the amended complaint requested that the court provide the following relief:

> A.   Enter a declaration that it is the role of [p]etitioner [t]rustee Julie Shelton to determine what amounts need to be made available to the EMT Trusts so that the Trustee can fulfill her fiduciary obligations to make the appropriate distributions to the beneficiaries of the EMT Trusts to provide for their education and maintenance in health and reasonable comfort and that it is the role of the [r]espondents [i]nvestment [d]irectors Samuel A. Tamposi, Jr. and Steve A. Tamposi to manage the assets of the EMT Trusts so that the needs are met;

> B.   Order [r]espondents to cooperate with [p]etitioner [t]rustee Julie Shelton, in causing the restructuring of the assets owned by the EMT Trusts, on commercially reasonable terms, so that the assets of the EMT Trusts can be decoupled from the assets of the other subtrusts created by the 1992 Trust Instrument and from the control of the [r]espondents, and further ordering that the proceeds and other assets resulting from said restructuring shall continue to be administered pursuant to the terms of the 1992 Trust Instrument;

> C.   Order [r]espondents to cooperate with [p]etitioner Elizabeth M. Tamposi, in causing the restructuring of her ownership interests in the Gifted Assets, on commercially reasonable terms, so that those interests can be decoupled from the other ownership interests in the Gifted Assets and be removed from the control of the [r]espondents;

> D.   Order [r]espondents to manage the investments owned by the EMT Trusts consistent with their fiduciary duties of prudent administration so that sufficient cash is generated to meet the short, intermediate and long-term needs of the beneficiaries of the EMT Trusts, as determined by [p]etitioner Shelton.

(N.H. Litigation Am. Compl. at 17-18).

---

(Weisman Dep. at 270-71).

As to the mention of the Gifted Assets in the amended complaint, McIntyre testified:

A.    The way I recall it is the [G]ifted [A]ssets did not become part of the
action until the [a]mended [c]omplaint was filed.  At that time I was asked
to do some research on jurisdiction and I was quite convinced that the
probate court did not have jurisdiction over anything related to the
[G]ifted [A]ssets, but the decision was made to include them.

Q.    So you voiced your opinion based on your research, but your voice did not
prevail in the discussion?

A.    Correct.

(McIntyre Dep. at 37).

In early 2009, Betty and Shelton retained John Langbein, a professor at Yale Law

School, as their trust expert in the New Hampshire litigation.  (Weisman Dep. at 366; McIntyre

Dep. at 63; Langbein Expert Rep. at 1).  Among other things, Professor Langbein provided an

opinion that (1) Shelton had a fiduciary obligation to file the New Hampshire complaint against

Sam and Steve; (2) the filing of the breach of fiduciary duty claim was not a violation of the *in*

*terrorem* clause; and (3) requesting the remedies listed in both the original and amended

complaints did not violate the *in terrorem* clause.  (Denby SMF ¶ 112; Langbein Expert Rep. at

10-13).  He provided those opinions in both an expert report (dated April 15, 2009) and later in

testimony at trial.  (Denby SMF ¶ 112; Order, N.H. Litigation (Aug. 18, 2010); Dkt. No. 182,

Ex. 102, at 28-29, 32).

On October 19, 2009, Denby sent a letter to Betty and Shelton that read:

I am sad to inform you that the receivable in this matter has reached the point that
my firm has instructed me to disengage from representing you.  As you know, our
firm policy requires that outstanding bills be paid within 30 days.  I now have 6
months of bills that are unpaid for an outstanding balance of $187,997.85.  I
realize, of course, that that you do not currently have the funds available to pay
this receivable.  Under the circumstances, I am constrained to withdraw and close
my file.  Should the situation change, such that you are able to bring the

receivable current, I would be pleased to represent you again in this or other
matters.

(Dkt. No. 182, Ex. 99).   Nonetheless, and as described below, Denby appeared to render advice,

and record time, to a limited extent after her purported disengagement.

## I.   The New Hampshire Trial and Post-Trial Litigation

The New Hampshire trial began on November 30, 2009.  (Denby SMF ¶ 111; Dkt. No.

182, Ex. 100).  Weisman and McIntyre served as trial counsel for Betty and Shelton, with

Weisman serving as the "first chair" attorney and McIntyre as the "second chair."  (Denby SMF

¶ 111; Weisman Dep. at 133; McIntyre Dep. at 204; McIntyre SMF ¶ 63).

Betty was present for the entire trial, and Shelton was present for most of it.  (Denby

SMF ¶ 111).  Denby was not physically present at the trial except to testify as a witness.  (*Id.*).

Shelton testified that Denby "was occasionally receiving some reports as to what was

happening during the trial" and that "we were calling her and asking her questions from time to

time."  (Shelton Dep. at 714).  Shelton also testified that "Stephanie [Denby] was really directing

a lot of the substance of the litigation throughout the entire time."  (Shelton Dep. at 216).  She

further testified:

> Q.     So the trial lawyer decisions were being made by Mr. Weisman, correct?
>
> A.     Yeah.  Michael made the trial lawyer decisions at trial.  The substance of the
>        claims is what I was referring to when I said that Stephanie weighed in on
>        those or directed them.

(*Id.* at 216-17).

Shelton testified as follows as to the extent of her involvement in the trial:

> Q.     Is it fair to say that on most of the trial days, after the trial day was over,
>        you met with Mike and Betsy in the war room at the hotel for some period

of time to help you get ready for the next day?

A.      Well, it's fair to say that I met with them.  I was not acting with trial
        counsel.  So I was not necessarily helping them get ready for the next day.

Q.      Well, you billed long hours each trial day for both trial and trial
        preparation, didn't you?

A.      Yes, and some of that was simply managing witnesses, like keeping Betty
        off of Michael's back.

Q.      . . . [Y]ou billed 149 hours on this matter in December of 2009, which was
        a heavy trial month, right?

A.      Yes.  And I can—I can tell you, you know, there wasn't—Michael's office
        didn't have adequate administrative staff.  So I ended up making copies,
        making lists, putting deposition—or, putting exhibits in folders,
        reorganizing notebooks.  I did the kinds of things I used to do when I was
        a paralegal.  And I did it only because there was nobody else to do it and
        Michael needed me to do it.  There was disorganization that needed to be
        straightened out.  So I did it.  I also made lunches and went shopping for
        the supplies.

Q.      And did you bill time for that—all that?

A.      Not all of it.

(Shelton Dep. at 844-46).

Denby testified at trial on December 2, 2009.  (Trial Tr. at 388, 398, N.H. Litigation

(Dec. 2, 2009)).  During her testimony, she was asked to describe her role in the case.  *Id.* at 400.

After explaining that she was originally retained by Betty and had also served as a counsel for

Shelton, she was asked the following question and gave the following response:

Q.      And have you played a role in this litigation?

A.      I act as fiduciary counsel to assist the litigation team, and also to assist the
        trustee.

(*Id.*).[32]

Betty testified over the course of several (apparently non-consecutive) days in late November and early December 2009.  (W&M SMF ¶ 50).  The remaining parties to this action appear to agree that certain facts came out on her cross-examination that "undercut [her] credibility."  (*Id.* ¶ 49).  Those included her "apparent untruthfulness about her father's intentions, about how much money she had been receiving from the EMT Trusts, and about how she answered certain questions on a loan application submitted to Sovereign Bank."  (*Id.*).

At Weisman's deposition, he testified as follows:

Q.      Did Betty Tamposi ever fail to heed any advice you rendered to her?

A.      I think my answer to that question is yes.

Q.      Okay.  And to what do you refer?

A.      I tell my clients when they testify to tell the truth, and I do not believe Betty Tamposi told the truth.

Q.      Okay.  And what do you believe she failed to tell the truth about?

A.      I don't think I can recall all of the particulars, but I was left with the general impression that she had not been fully honest in disclosing her financial position and resources, nor was she fully honest in completing the Sovereign Bank loan application, and there may—I believe that there are some other examples, but one that comes to mind with respect to the Sovereign Bank application is she

---

[32] Denby's direct examination was conducted by McIntyre.  (McIntyre Dep. at 64).  McIntyre testified as follows:

Q.      When Stephanie Denby came to testify, so far as you knew was she still engaged as counsel to Elizabeth Tamposi and Julie Shelton?

A.      Yes.

Q.      And throughout the trial?

A.      I believe so.

(*Id.* at 147).

answered that application that—the question was she involved in any litigation, she answered that question "no" when in fact she was involved in two lawsuits at the time that she completed that application.  But there were too many examples—too many instances where her answers did not seem to conform—comport with what we came to understand to be the truth.

Q.      When did you first form the impression that Betty wasn't telling the truth about these things that you just mentioned?

A.      Trial.
. . .

Q.      Apart from whatever Betty Tamposi received to pay taxes, is it correct that you learned at or about the time of trial that Betty Tamposi had received payments in the past from the EMT Trusts that were substantially in excess of $250,000 a year?

A.      There was a lot of evidence at trial about amounts that had been paid to Betty, to her—and to the EMT Trusts.  I don't recall the particulars, but it was certainly an issue that we—that we—that there was evidence about at trial.

Q.      Did you believe that Miss Tamposi had misled you with respect to the amount of money that she had historically received from the trusts?

A.      I had concerns about that during trial.

(Weisman Dep. at 107-08, 355-56).

Shelton testified that during the trial she discussed the issue with Weisman:

A.      I remember Michael saying to me, like, referring to himself, "How does it feel to know your client is lying?"  And he was referring to himself. That's what he said to me.

        And I said, "This is awful."  And that's what I remember.
. . .

Q.      Were you concerned at the time at how it impacted you to have Betty lie?

A.      I don't think I realized the full potential of harm to me at the time.
. . .

A.      I was concerned about the impact on the trial.  I don't remember being

43

specifically concerned about myself.

Q.      And that's not an issue that you raised with Mike or Betsy, correct?

A.      Correct.

(Shelton Dep. at 846-51).

On the same subject, McIntyre testified:

Q.      When Betty Tamposi gave her testimony that you found surprising, did you give any thought to whether you should withdraw from representing her?

A.      I'm sure we did.

Q.      Do you remember discussing that question?

A.      Not as I sit here today.
. . .

Q.      And I assume when Betty Tamposi gave the testimony that you found surprising you certainly gave thought to what impact it would have on the case?

A.      Yes.

Q.      And who did you discuss that with?

A.      Michael Weisman, Julie Shelton, probably Stephanie Denby.  I believe that would have been it.
. . .

Q.      What do you recall discussing with them about the impact on the case of the testimony that Elizabeth Tamposi had given?

A.      What I recall is that we went—we discussed it in depth and a decision was made in which everyone agreed that the best strategy was to rehabilitate her on redirect.  And that there was some question, even in our minds, whether the statements she made on the loan application had just been inadvertent rather than simply untrue, and the same with the family meeting.  We had no way of knowing whether she was telling the truth.

Q.      So the plan was to have a targeted redirect examination of her?

A.    Yes.

. . .

Q.    When Elizabeth Tamposi gave the testimony that you found surprising did
       you give any thought to what, whether it might have an impact on Julie
       Shelton herself?

A.    Julie personally?

Q.    Yes.

A.    I'm sure our thinking was about the impact of the testimony on the case as
       a whole, and she was a part of the case.

(McIntyre Dep. at 146-48).

Asked why he chose to try to rehabilitate Betty on redirect, Weisman testified:  "We had

a war room and Betty, Julie—well, for these purposes, Betsy, Julie, and I talked every day and

felt that this was the right approach."  (Weisman Dep. at 363).  He also testified, on the same

subject:  "During trial I felt that the areas that Betty was impeached on were ones that we could

rehabilitate her on, did not go to the heart of the case. . . . I thought that the areas where we could

rehabilitate her did not go to the core of her testimony."  (*Id.* at 109).

On December 9, 2009, the probate court heard testimony from Jody Wilbert, who had

been appointed by the court as guardian *ad litem* representing the interests of the unborn

beneficiaries of the EMT Trusts.  (W&M SMF ¶ 60; Dkt. No. 193, Ex. 10, at 2-3; Trial Tr., N.H.

Litigation (Dec. 9, 2009)).  Wilbert testified, among other things, that the conflicts between the

investment directors and the beneficiaries of the EMT Trusts were likely to continue and that

there were "ways to minimize the costs of decoupling."  (Trial Tr. at 1688, 1690, N.H. Litigation

(Dec. 9, 2009)).  She further testified:  "With regard to how my charges would be best served, I

think that—that the situation begs for resolution.  And it—it begs for some kind of a dissolution

of the situation."  (*Id.* at 1693).

On December 13, 2009, Shelton sent an e-mail to Weisman (with a copy to McIntyre and a W&M paralegal) in which she suggested a number of questions for him to ask her on direct examination.  Among those were, "Did you do a financial cost benefit analysis before filing case[?]" and "Have you been able to calculate the cost of a de coupling[?]"  (Dkt. No. 193, Ex. 2, at 418).[33]

During Shelton's direct examination at trial, Weisman asked her the following question and she gave the following response:

Q.    Have you considered both the non-economic and economic consequences, or both the pros and cons of a decoupling?

A.    Yes. And I was asked – I've been asked did you perform a cost benefit analysis.  And I did not do a financial accounting type of analysis.  I don't have the ability to do that. Not only do I not have the ability to do that, I don't have the information to do that. I don't think that I would be capable, or even somebody I hired would be capable of determining exactly what the capital gains tax would be for a variety of assets or the appreciation or the depreciation. I don't think I'm capable of doing that kind of an analysis.  But what I am capable of doing is the kind of analysis actually that the [guardian *ad litem*] talked about in her testimony, which is whether or not the situation on the ground works. And as I said before, it doesn't work for my beneficiaries because I've been unable to do what I'm supposed to do under the trust instrument.

(Shelton Trial Testimony at 2089-91).[34]

On cross-examination, Shelton was confronted with, among other things, the testimony

---

[33] Shelton had testified at her deposition that she had done a cost-benefit analysis, but she had become concerned at some point that her testimony could be misconstrued and that the respondents would attempt to imply at trial that she had not.  (W&M SMF ¶ 55; McIntyre SMF ¶ 69; Shelton Dep. at 642-43, 715-17).  She testified at her deposition in this action:  "I thought it was important that we let the [c]ourt know that—that we performed a cost benefit analysis, yes."  (Shelton Dep. at 717).

[34] The quoted trial testimony does not appear to be in the record, apparently because the W&M Parties attached the incorrect pages to their statement of material facts.  (*See* Resp. to W&M SMF ¶ 57; Dkt. No. 193, Ex. 2, at 480-81).  However, because both the W&M Parties and the Shelton Parties agree to the accuracy of the quotation, the Court will accept it as accurate.  (*See* W&M SMF ¶ 57).

she had given at the July 8, 2008 deposition in the Massachusetts litigation that she had "no basis

to claim that [Sam and Steve] ha[d] mismanaged assets." (Denby SMF ¶ 100).

Professor Langbein, the trust expert, was cross-examined on the subject of a trustee's

responsibility to conduct a cost-benefit analysis. (McIntyre SMF ¶ 73). He acknowledged that if

Shelton failed to conduct such an analysis before bringing suit against the investment directors,

that would have been a breach of her fiduciary duty. (*Id.*; Shelton Dep. at 900).[35]

The New Hampshire trial ended on January 22, 2010. (Denby SMF ¶ 111; Dkt. No. 182,

Ex. 100). In total, Betty and Shelton had called eleven witnesses in their case in chief.

(McIntyre SMF ¶ 63). Weisman gave the opening statement; handled the direct examinations of

ten of the eleven witnesses, including Betty and Shelton; conducted the cross-examination of

eight of the eleven witnesses called by the respondents; and gave the closing argument. (*Id.* ¶¶

63, 74).

Weisman had begun drafting various post-trial submissions by January 27, 2010. (Dkt.

No. 193, Ex. 5, at 201). On January 28, 2010, McIntyre began drafting proposed findings of fact

and conclusions of law. (*Id.* at 202). She continued work on the document encompassing those

---

[35] At her deposition, Shelton was asked what more Weisman could have done to emphasize that she had in
fact performed a cost-benefit analysis before filing suit. She responded:

> Well, maybe he could have worked with—I guess this would be Betsy [McIntyre] because Betsy
> put Langbein on, but for example, Langbein said that I should have conducted one, and if I didn't
> conduct one, it was a problem. And there should have been, I think, testimony from Langbein that
> said, "Yes, I understand that she did conduct one. Here's what we're talking about. And it doesn't
> have to be somebody sits down and runs the numbers. It can be the kind of cost benefit analysis
> that Stephanie and Julie collaborated on," or whatever, "at the beginning, and Betty, and decided
> that this lawsuit was required. And that wasn't done.

(Shelton Dep. at 900). McIntyre helped Langbein prepare his expert report and was involved in his preparation for
his deposition and for trial. (McIntyre Dep. at 63-64; *see, e.g.*, Dkt. No. 193, Ex. 5, at 135, 178, 184).
Notwithstanding Shelton's deposition testimony, the parties appear to agree that Weisman handled his direct
examination and defended his cross-examination. (McIntyre SMF ¶ 74).

proposed findings and conclusions through February 8, 2010.  (*Id.* at 202-03).[36]

On February 8, 2010, Sam, Steve, and the intervenors filed a memorandum of law that

included the following language:

> [T]he Court should award [r]espondents and [i]ntervenors their reasonable
> attorneys' fees and costs.  Petitioners are jointly and severally liable for the
> reasonable attorneys' fees of [r]espondents and [i]ntervenors.  They shall not use
> any funds from the trusts to pay these fees.  Petitioners shall not use distributions
> from the EMT Trusts to satisfy this judgment against them.  Petitioners shall not
> ask the Goodlander children to satisfy the judgment against [p]etitioners by using
> funds the Goodlander children are entitled to from the EMT Trusts.

(Resp. and Intervenors' Mem., N.H. Litigation, at 53).

On the same day, Sam, Steve, and the intervenors filed a proposed order with the court.

(Denby SMF ¶ 114; Dkt. No. 182, Ex. 104).  That proposed order stated in part:

> All parties have requested that the opposing side pay their attorneys' fees and
> costs pursuant to [N.H. Rev. Stat. Ann. §] 564-B:10-1004.  The Court finds that
> [p]etitioners did not commence this litigation in good faith[,] violated their
> Settlement Agreement and that the litigation was commenced for the benefit of
> one of thirty-two beneficiaries to the detriment of all others.  Accordingly,
> Petitioners' requests for costs and fees is DENIED.  Petitioners['] nearly
> exclusive focus in this litigation was on the liquidation remedy sought in their
> [o]riginal [c]omplaint, and the decoupling remedy sought in their [a]mended
> [c]omplaint.  These remedies were not warranted under any circumstance.
> Respondents' and [i]ntervenors' requests for costs and fees are GRANTED.
> Petitioners are jointly and severally liable for these fees, and must use personal
> funds to satisfy the judgments once they are issued.

---

[36] Shelton billed 3.9 hours on February 5 ("Revise and edit proposed findings of fact, communicate with M. Weisman and B. Tamposi regarding same") and 4.5 hours on February 9 ("telephone conference . . . regarding language for proposed order, multiple telephone conferences with M. Weisman regarding proposed findings, [and] drafting proposed findings").  (Dkt. No. 193, Ex. 2, at 366).  Shelton testified that she had "some limited input" in the drafting process of the proposed findings of fact and conclusions of law.  (Shelton Dep. at 717-18).  Weisman testified that Shelton participated in the drafting process and that he spoke with her by e-mail and telephone about what should be submitted.  (Weisman Dep. at 389-90).  W&M's billing records reflect that Weisman had two telephone conferences (totaling 1.3 hours in length) during the period:  one on February 2, 2010, with Shelton, and another on February 3, 2010, with Betty and Shelton.  (Dkt. No. 193, Ex. 5, at 202).

(Proposed Order, N.H. Litigation (Feb. 8, 2010), ¶ 5).[37]

Also on February 8, 2010, Shelton sent a draft of the petitioners' proposed findings of fact and rulings of law (the document that McIntyre had begun drafting on January 28) to Weisman and McIntyre.  (Denby SMF ¶ 115; Dkt. No. 182, Ex. 106).  In the e-mail accompanying the draft, Shelton wrote:  "The attached has changes from my most recent conversation with Betty.  We won't have any more changes relating to this portion of the proposed findings."  (Denby SMF ¶ 115; Dkt. No. 182, Ex. 106).  After February 8, 2010, McIntyre did not record any further time working on matters for Betty or Shelton.  (McIntyre SMF ¶ 76; Dkt. No. 193, Ex. 5, at 203-08).

On February 9, 2010, Betty and Shelton (through Weisman and McIntyre) filed a document with the court entitled, "Petitioners' *Revised* Requests for Findings of Fact and Rulings of Law."  (Denby SMF ¶ 115; Dkt. No. 182, Ex. 105).  Paragraph 43 of that filing stated, in part:  "Under the UTC, this Court may award reasonable attorney's fees, costs and expenses "as justice and equity may require . . . to be paid by another party or from the trust that is the subject of the controversy."  (Petitioners' Revised Requests for Findings of Fact and Rulings of Law, N.H. Litigation ¶ 43 (Feb. 9, 2010)).  Immediately after that sentence appeared a citation to N.H. Rev. Stat. Ann. §564-B:10-1004.  (*Id.*).

At her deposition, Shelton was asked the following questions about that passage of the proposed findings of fact and rulings of law and gave the following responses:

Q.      When you read that, were you concerned?

---

[37] N.H. Rev. Stat. Ann. § 564-B:10-1004 provides as follows:  "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."

A.      Well, if I was, it was a little late since the trial was over.

Q.      . . . Were you concerned when you read that fees could be assessed against another party since you were a party in the case?

A.      I don't recall.

Q.      Did you raise the subject with Mike saying, "I never heard of that statute. Why didn't you tell me about that statute before I brought this lawsuit?"

A.      I doubt it.

. . .

Q.      When you saw that statute quoted in the proposed findings, did it concern you enough to consult your attorney about it?

A.      No.

(Shelton Dep. at 838-39).

At some point in the spring of 2010, after the trial but before the court had made its decision, Shelton approached Weisman and told him that she wanted to resign as trustee. (W&M SMF ¶ 67; Shelton Dep. at 813, 839-40). According to her deposition testimony, he responded by saying, "The judge likes you a lot better than Betty. You can't resign right now." (Shelton Dep. at 813). After that conversation, she spoke with Brian Burke, counsel to Baker Daniels at the time, who gave her independent advice as to the possibility of resignation. (*Id.* at 840-42). Shelton did not resign. (*Id.* at 842).

On August 18, 2010, Judge Cassavechia issued an order in the New Hampshire litigation. That order included the following statements, among others, that represented the court's findings and conclusions with respect to Shelton:

[Shelton] testimonially admitted that there was no evidence that Sam[] and Steve had mismanaged the EMT Trusts' assets.

. . .

In August and early September 2007, Betty and Shelton interviewed at least three litigation attorneys in Boston, Massachusetts.  They testified that they initially contacted attorneys to discuss a malpractice action against Attorney Couser.  This related to Betty's claim that the attorney may not have appropriately represented her in negotiating the Settlement Agreement, as well as other advice he provided unrelated to this litigation.  However, given that Betty and Shelton were discussing a buy-out and issues regarding the Red Sox on or prior to August 22, 2007, it is reasonable to infer from their actions and the exhibits that their search for legal counsel included discussion of further litigation over the EMT Trusts.  It is notable that contact, and at least one of these meetings with potential attorneys, occurred even before Trustee Shelton introduced herself to the investment directors or the former trustee.

. . .

On September 7, 2007, Shelton sent a letter to the investment directors asking them to provide her with $2 million within 7 days for the immediate cash needs of the trust beneficiaries.  The letter was not addressed or sent to the former trustee, Gerald Prunier.  At the time it was sent, Shelton had not taken possession of, nor had she reviewed and determined[,] the estimated worth of the trust assets.  She also had not taken into account the other income and resources of the beneficiaries at that time.  Further, the record does not show that Betty or her children had any emergency that required a cash payment, let alone $2 million within 7 days; in fact, Betty was then current on most of her financial obligations.

. . .

[O]n that same day, at 7:02 in the morning, Steve emailed Shelton from Florida a message stating that Sam[] would be out of the country until September 18 starting the next day, that he and Sam[] would make themselves available for a meeting on September 19 or September 20, after Sam[]'s return, and suggesting, based on concerns of economy, that the meeting be by telephone to "explore any issues that require our attention," with any unresolved matters reserved for a later face to face meeting.  Shelton responded later that day from Chicago at 4:40 p.m., informing that she had "never found telephone conferences to be as productive as face to face meetings"; that she felt it "far more productive, as well as more economical, efficient and prudent for [them] to meet in person"; that a face to face meeting with her was "part of [his] responsibility as an investment advisor"; and that she would not agree to a telephone conference.  Given the one hour time difference between Steve's location in Florida and Shelton's in Illinois, it is reasonable to deduce that Steve's email was available for receipt at the start of Shelton's workday, while Steve's receipt of Shelton's email would have been near or after the end of that workday, a Friday.  The "$2 million within 7 days letter" was sent by Federal Express from Shelton to Steve and Sam[] at an

unspecified time on September 7.  From the sequence of events, it is reasonable to infer that Shelton knew Sam[] would not receive the letter until after the 7 days had expired; that Shelton's letter was triggered by Steve's morning email; and that it was designed to bolster her insistence that the meeting be held "face to face."

. . .

When Trustee Shelton's "request" was not satisfied and she had received no other response, she followed up with another letter September 14, 200[7] demanding that the Red Sox be sold with the resulting cash distributed immediately.  Her endeavors to at once interview and retain litigation attorneys while seeking to personally meet with and receive an enormous financial distribution from the investment directors, ensuing as it were on parallel tracks within the same or overlapping timeframes, persuades the court that her press for cash was unreasonable and not grounded in good faith.

. . .

The trustee and the investment directors have an obligation to cooperate and keep the other informed about the administration of the trust.  The petitioners have not met their burden in proving that the respondents refused to cooperate with the trustee.  In August and early September 2007, the petitioners were meeting with litigation attorneys in Boston.  By September 16th, prior to the scheduled September 20th meeting with the respondents, the petitioners were drafting a complaint.  Betty, through her attorney, proceeded to cancel a September 28th meeting with the respondents at Attorney Sklar's office.  The court is mindful that throughout the August and September 2007 timeframe the petitioners' agenda was undisclosed—a buy-out of the EMT Trusts assets and the Tamposi Company assets owned individually by Betty.  In this regard, the trustee herself acted toward the investment directors in a noncooperative fashion.

. . .

This action contests several provisions of the trust including, among others: the role of the investment directors (Article TENTH-B); authority of investment directors to retain assets in common with other sibling trusts (Article TENTH); and their right to retain substantial trust assets as or in real estate (Article TENTH-A).  The court finds that in bringing and prosecuting this litigation the petitioners have acted in bad faith.

. . .

The actions of the petitioners in bringing this matter to court were motivated by a

desire to force a buy-out of Betty's share of the trust and non-trust assets.

. . .

It was clearly the intent of Sam[uel Tamposi] in devising his trust strategy, that the Tamposi family business would continue; that the trust assets would be managed and invested together; that his children would be treated equally; and that family bonds would be cemented as a result.  In this litigation, the petitioners aspire to defeat these purposes by disengaging the interests of Betty and her issue from the train, taking it down an independent track where they will be free to choose their own destination and route for getting there.

. . .

The petitioners contend that this litigation concerns breaches of fiduciary duty by the investment directors, affording a free pass from the *in terrorem* clause's bite under Article FOURTEENTH.  The court finds this argument unpersuasive.  As early as August 2007, petitioners planned to bring litigation concerning the trust, prior to most or all of the breaches alleged in the petition and even prior to introducing the new trustee to the investment directors or the former trustee.  The *in terrorem* clause has been violated.  The court finds and rules that Elizabeth M. Tamposi has forfeited her right, title and interest in the trust. . . . It finds further that Betty forfeits her right, title and interest in the EMT Trusts as of the date of filing the original [c]omplaint.

. . .

[N.H.] Rev. Stat. Ann. § 564-B:7-706 provides that the court itself may remove a trustee on its own initiative.  Trustee Shelton testified at the final hearing, and the court finds as credible, that she reluctantly agreed to serve as trustee because Betty was unable to procure an institutional trustee.  Shelton does not wish to continue serving as trustee for the long-term.  She had no prior experience in trust administration, and accepted her appointment as trustee without thoroughly evaluating the trust terms or understanding her role or duties.

Trustee Shelton is a party to this litigation.  She colluded with Betty in creating controversy with the investment directors.  She participated with Betty in interviewing and hiring litigation counsel to bring this lawsuit.  This litigation has cost millions of dollars in fees for the attorneys, trustees, experts and other litigation costs and expenses.  Shelton did not conduct an appropriate cost/benefit analysis prior to bringing this litigation, as suggested by her own expert, John Langbein.

(Order at 12-16, 37, 45-47, 50, N.H. Litigation (Aug. 18, 2010) (citations and footnote omitted)).

In the conclusion to his August 18, 2010 order, Judge Cassavechia ordered that Shelton be removed as trustee of the EMT Trusts and that both Betty and Shelton were individually liable for the attorneys' fees and costs of Sam, Steve, and the intervenors.  (*Id.* at 53; Denby SMF ¶ 117).  He did not order a surcharge against Shelton.  (Denby SMF ¶ 129; Order, N.H. Litigation (Aug. 18, 2010)).[38]

As noted, Judge Cassavechia specifically found in his August 18, 2010 order that Shelton had acted in bad faith.  The individual defendants—Shelton, Denby, Weisman, and McIntyre—all apparently agree that Shelton had not, in fact, acted in bad faith, and that the judge's conclusion was wrong.  (Denby SMF ¶ 119; Shelton Dep. at 709, 803; Weisman Dep. at 376; McIntyre Dep. at 144-45).[39]  They further appear to agree that Judge Cassavechia did not give any express indication during the trial that he was considering a finding of bad faith against Shelton.  (Denby SMF ¶ 119; Shelton Dep. at 730).

After Shelton was removed as trustee, Thomas Jalkut took over as trustee of the EMT Trusts.  (Denby SMF ¶ 129; Brief of Appellant Julie Shelton, *Shelton v. Tamposi*, 164 N.H. 490, 62 A.3d 741 (2013) (No. 2010-634)).  He resigned on June 13, 2011, and was replaced by James R. DeGiacomo.  (*Id.*).  On June 22, 2011, DeGiacomo moved for a surcharge award of more than $3 million against Shelton.  (Denby SMF ¶ 129; Dkt. No. 182, Ex. 110).  In that motion,

---

[38] As of May 7, 2014, there had been no ruling by Judge Cassavechia as to the specific amount of attorneys' fees that Shelton was responsible to pay as a result of his August 18, 2010 order.  (Shelton Dep. at 688).  According to an affidavit filed by Robert M. Buchanan, Jr., one of the attorneys for the Shelton Parties in this action, the parties recently reached and signed an agreement to settle the claim for attorney's fees with a payment of $1.5 million.  (Buchanan Aff. ¶ 5).

[39] Testifying about the August 18, 2010 order, Shelton stated:  "[C]learly the judge mixed me up in some respects with Betty.  And I think he had—I think that was kind of like her bad acts rubbed off on me, her lack of credibility rubbed off on me, his distaste for her rubbed off on me.  And I was kind of lumped in with her in a way that actually wasn't really fair or accurate."  (Shelton Dep. at 866-67).

DeGiacomo contended that "a surcharge award should also include any other fees paid to Julie

Shelton's law firms that make up any portion of her compensation as trustee." (Motion for

Surcharge Award, *Shelton v. Tamposi*, No. 316-2007-EQ-02109 (2007)).[40]

Shelton appealed Judge Cassavechia's August 18, 2010 order to the New Hampshire

Supreme Court. (Brief of Appellant Julie Shelton, *Shelton v. Tamposi*, 164 N.H. 490, 62 A.3d

741 (2013) (No. 2010-634)). Among other things, she appealed the finding of bad faith and the

award of attorneys' fees and costs against her in her personal capacity. (*Id.* at 17). In her brief,

Shelton argued:

> There is also no precedent for holding a trustee *personally* liable to pay attorneys'
> fees in a situation where (a) she sued only in her capacity as [t]rustee, (b) the
> principal trust beneficiary joined as a petitioner in the suit, (c) all of the other
> living beneficiaries supported the prosecution of the suit and the requests for
> relief made by a trustee, and (d) a disinterested, court-appointed [guardian *ad
> litem*] for all unborn beneficiaries of the trust also supported the [t]rustee's
> request for relief.

(*Id.* at 46) (footnote omitted). Counsel for Shelton in her appeal were Robert Frank and Robert

M. Buchanan, Jr.; those attorneys are also representing Shelton in this action. (*Id.* at 50; Shelton

Dep. at 747). According to Buchanan's affidavit, the Shelton Parties incurred legal expenses of

approximately $950,000 for services related to the appeal, plus approximately $1.25 million for

services related to the post-trial proceedings in the Probate Court. (Buchanan Aff. ¶ 4).

Betty did not appeal the probate court's decision. Asked if she would have been

receptive had Betty approached her to finance an appeal, Shelton stated: "No. . . . Because I

---

[40] As of November 14, 2014, no surcharge had been awarded against Shelton. (Denby SMF ¶ 131; Shelton
Dep. at 778). According to the affidavit of attorney Robert M. Buchanan, Jr., counsel for the Shelton Parties, the
parties have "reached an agreement to settle the surcharge exposure" with a payment of $750,000. (Buchanan Aff. ¶
6). According to the affidavit, the settlement agreement is subject to approval by the New Hampshire probate court.
(*Id.*).

want to be as far away from Betty as possible in every way." (Shelton Dep. at 896-97).[41]

On August 21, 2012, the New Hampshire Supreme Court remanded the case for clarification in order to determine the basis of the Probate Court's fee award against Shelton. (Order, *Shelton v. Tamposi*, 164 N.H. 490, 62 A.3d 741 (Aug. 21, 2012) (No. 2010-634); Denby SMF ¶ 126).

On September 5, 2012, Judge Cassavechia issued a "Clarification of Order on Remand from Appeal." (Denby SMF ¶ 127; Dkt. No. 182, Ex. 108). In that document, the court stated that "[t]he award of fees was premised on both New Hampshire statutory and common laws" and cited N.H. Rev. Stat. Ann. § 564-B:10-1004 and the case of *In re Mallett and Mallett*, 163 N.H. 202, 211-12, 37 A.3d 333, 340 (2012) (citing *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617, 619 (1977)) in support. (Clarification of Order on Remand from Appeal at 2, N.H. Litigation (Sep. 5, 2012)).[42] The court also stated that "the fee award was based on Shelton and Betty's initiation and prosecution of the subject litigation, not for violation of the *in terrorem* clause per se." (*Id.*).

On January 11, 2013, the New Hampshire Supreme Court affirmed Judge Cassavechia's award of fees against Shelton. The order stated in part:

> In this case, the probate court made extensive findings and rulings that its fee award was based on Shelton's and Betty's initiation and prosecution of the litigation giving rise to this appeal. These rulings included that the litigation

---

[41] At some point, Betty approached Shelton about using Weisman as counsel for Shelton's own appeal, but Shelton declined. (Shelton Dep. at 894-95). She then asked Weisman to withdraw from her representation. (*Id.* at 895).

[42] In *Mallett*, 163 N.H. at 211-12, 37 A.3d at 340, the Supreme Court of New Hampshire stated: "[A]n award of attorney's fees to one party is permissible where the other party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons, where the litigant's conduct can be characterized as unreasonably obdurate or obstinate, and where it should have been unnecessary for the successful party to have brought the action.'" (quoting *Harkeem*, 117 N.H. at 691, 317 A.2d at 619).

constituted a breach of Shelton's fiduciary duties and constituted bad faith. Based upon the record before us, we conclude that the trial court sustainably exercised its discretion in concluding that justice and equity require that Shelton, rather than the innocent beneficiaries of the trust, bear the burden of paying fees to the parties based upon her own bad faith.

*Shelton*, 164 N.H. at 503, 62 A.3d at 752 (2013).

On August 10, 2013, trustee DeGiacomo filed a complaint in New Hampshire Superior Court against Butler Rubin and Baker Daniels, seeking to hold them liable "[u]nder the doctrines of respondeat superior and vicarious liability" for the amounts owed by Shelton to the EMT Trusts. (Complaint ¶ 41, *DeGiacomo v. Butler, Rubin, Saltarelli & Boyd, LLP*, No. 1:13-cv-405-SM (D.N.H. 2013); Dkt. No. 209, Ex. 31, at 7-17). On September 12, 2013, defendants removed that case to the United States District Court for the District of New Hampshire. (Dkt. No. 209, Ex. 31, at 4). On October 16, 2013, the parties agreed to stay that case pending resolution of the underlying probate court matter. (*Id.* at 6). On March 27, 2015, the parties agreed to dismiss the action with prejudice. (Stipulation of Dismissal, *DeGiacomo v. Butler, Rubin, Saltarelli & Boyd, LLP*, No. 1:13-cv-405-SM (D.N.H. 2015)).

## J.    The Present Action

### 1.    Procedural History

On December 31, 2010, Betty Tamposi filed a complaint in this Court against Denby; Burke, Warren; Weisman; McIntyre; W&M; Shelton; Butler Rubin; and Baker Daniels. (Dkt. No. 1). The complaint alleged legal malpractice, breach of fiduciary duty, and conflict of interest. (*Id.* at 13-20).

On February 19, 2013, the Shelton Parties (Shelton, Butler Rubin, and Baker Daniels) answered the complaint and filed crossclaims alleging legal malpractice on the part of the Denby

Parties (Denby and Burke, Warren) and the W&M Parties (Weisman, McIntyre, and W&M) and seeking contribution and indemnification from all crossclaim-defendants.  (Dkt. No. 53).  They also filed a counterclaim against Betty Tamposi for misrepresentation and included separate counts for contribution and indemnification against her.  (*Id.*).

Also on February 19, 2013, the W&M Parties filed crossclaims for contribution and indemnification against the Denby Parties and the Shelton Parties, and the Denby Parties filed crossclaims for contribution against the Shelton Parties and the W&M Parties.  (Dkt. Nos. 52, 54).

On November 14, 2014, the parties filed five motions for summary judgment: (1) McIntyre moved for summary judgment as to the legal-malpractice crossclaim asserted against her in her individual capacity and as a member of W&M by the Shelton Parties; (2) the Denby Parties moved for summary judgment as to the crossclaims asserted against them by the Shelton Parties; (3) the Denby Parties moved separately for summary judgment as to the crossclaims asserted against them by Butler Rubin and Baker Daniels; (4) the Shelton Parties moved for summary judgment as to the claims of Betty Tamposi; and (5) the W&M Parties moved for summary judgment as to the crossclaims asserted against them by the Shelton Parties.

On December 23, 2014, the parties filed a stipulation of dismissal as to all claims other than those by the Shelton Parties for legal malpractice.  For that reason, the motion by the Shelton Parties for summary judgment as to the claims of Betty Tamposi is now moot.

## II.    <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when

the moving party shows that "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[]

mandates the entry of summary judgment 'against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.

1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that

determination, the court must view "the record in the light most favorable to the nonmovant,

drawing reasonable inferences in his favor."  *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009).  When "a properly supported motion for summary judgment is made, the adverse party

'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving

party may not simply "rest upon mere allegation or denials of his pleading," but instead must

"present affirmative evidence."  *Id*. at 256-57.

**III.**   **Analysis**

   **A.**      **Legal Malpractice Generally**

   "[A]n action for legal malpractice may be framed conceptually either as a tort or a breach

of contract."  *Wong v. Ekberg*, 148 N.H. 369, 376, 807 A.2d 1266, 1272 (2002) (quoting *Peters*

*v. Simmons*, 87 Wash.2d 400, 404, 552 P.2d 1053, 1055 (1976)).[43]  In New Hampshire, such an

action can be brought under either theory, but "the same facts often support both causes of action

and the remedies for them will usually not differ."  For that reason, New Hampshire courts, like

---

   [43] All parties agree that because the underlying attorney conduct occurred in New Hampshire, New
Hampshire law applies to this action.

the courts of other jurisdictions, often "blur the contract-tort distinction" and apply the same basic legal principles to each theory.  *Id.* at 376, 807 A.2d at 1272.

To establish legal malpractice under New Hampshire law, under either a contract or tort theory, a plaintiff must prove (1) the existence of an attorney-client relationship, "which placed a duty upon the attorney to exercise reasonable professional care, skill and knowledge in providing legal services to that client;" (2) a breach of that duty; and (3) "resultant harm legally caused by that breach."  *Yager v. Clauson*, 166 N.H. 570, 572-73, 101 A.3d 6, 9 (2014) (citing *Estate of Sicotte v. Lubin & Meyer, P.C.*, 157 N.H. 670, 674, 959 A.3d 236, 240 (2008).  "Whether [an] attorney has breached the applicable standard of care in representing the client is a question of fact to be determined through expert testimony and usually cannot be decided as a matter of law."  *McIntire v. Lee*, 149 N.H. 160, 168, 816 A.2d 993, 1000 (quoting *Cook v. Continental Cas. Co.*, 180 Wis.2d 237, 246, 509 N.W.2d 100, 103 (1993)).  However, "if an attorney's actions could under no circumstances be held to be negligent, then a court may rule as a matter of law that there is no liability."  *Id.* at 169, 816 A.2d at 1000-01 (quoting *Sun Valley Potatoes, Inc. v. Rosholt, Robertson & Tucker*, 133 Idaho 1, 5, 981 P.2d 236, 240 (1999)); *Estate of Sicotte*, 157 N.H. at 673-74, 959 A.2d at 239 ("Expert testimony is not required where the subject presented is within the realm of common knowledge and everyday experience.").

Where a malpractice claim is based on an alleged failure to give adequate advice, "the failure to advise must have been necessary to produce the plaintiff's subsequent harm . . . and the failure must have been a substantial factor, rather than a slight one, in producing it."  *North Bay Council v. Bruckner*, 131 N.H. 538, 548, 563 A.2d 428, 434 (1989).  "[P]roof of the causal link between negligent . . . advice and subsequent damage require[s] evidence of the buyer's reliance

upon the advice." *Id.* at 548, 563 A.2d at 434.  "It is therefore through the medium of the

plaintiff's reliance that the negligent advice must be shown to have been a substantial factor in

the plaintiff's subjection to the undisclosed risk that later materialized."  "[I]n most instances,

expert testimony is required to prove causation in a legal malpractice action."  *Carbone v.*

*Tierney*, 151 N.H. 521, 528, 864 A.2d 308, 314-15 (2004).

### B.  The Denby Parties' Motion for Summary Judgment as to the Law Firms

The Denby Parties contend that summary judgment should enter as to the claims of

Butler Rubin and Baker Daniels (the two law firms that employed Shelton during the relevant

period) for two separate, but related, reasons.  First, they point to the undisputed fact that neither

firm was ever a client of the Denby Parties and contend that the Denby Parties accordingly did

not owe them a duty of care.  Second, they note that the probate court's decision applied only to

Shelton and contend that it therefore created no liability (or other cognizable injury) on the part

of her firms.  Because the Court agrees with the Denby Parties that they owed no duty of care to

Butler Rubin or Baker Daniels, only the first point is addressed below.

"Whether a duty exists in a particular case is a question of law."  *Walls v. Oxford*

*Management Co.*, 137 N.H. 653, 656, 633 A.2d 103, 104 (1993); *see Furbush v. McKittrick*, 149

N.H. 426, 432, 821 A.2d 1126, 1131 (2003) (expressing the same rule for legal-malpractice

cases).  "As a general principle, 'the concept of "duty" . . . arises out of a relation between the

parties and the protection against reasonably foreseeable harm.'"  *Simpson v. Calivas*, 139 N.H.

1, 4, 650 A.2d 318, 321 (1994) (quoting *Morvay v. Hanover Ins. Co.*, 127 N.H. 723, 724, 506

A.2d 333, 334 (1986)).  The existence of a contract may create a duty, but "[i]n general, 'the

scope of such a duty is limited to those in privity of contract with each other.'"  *Id.* at 4, 650

A.2d at 321 (quoting *Robinson v. Colebrook Sav. Bank*, 109 N.H. 382, 385, 254 A.2d 837, 839

(1969).  However, "[t]he privity rule is not ironclad," and New Hampshire courts have

recognized some exceptions in the context of legal malpractice.  *Id.* at 4, 650 A.2d at 321.

In *Simpson*, 139 N.H. at 3, 650 A.2d at 320, a client had asked his attorney to draft a will

that left certain property rights to his wife and certain others to his son.  The attorney drafted the

will, but did so in such a manner that ultimately led the probate court (after the client's death) to

construe it as leaving a smaller bundle of property rights to the son than the client had intended.

*Id.* at 3, 650 A.2d at 320.  The son sued the attorney for legal malpractice, seeking damages for

the money he paid to acquire the property rights that his father had intended to devise to him.  *Id.*

at 3-4, 650 A.2d at 320-21.  On appeal, the New Hampshire  Supreme Court held that an attorney

who drafts a will for a testator client owes a duty of care to the intended beneficiaries of that

will, even where those beneficiaries were not themselves clients.  The court explained that

"although there is no privity between a drafting attorney and an intended beneficiary, the

obvious foreseeability of injury to the beneficiary demands an exception to the privity rule."  *Id.*

at 5-6, 650 A.2d at 322; *see also Hungerford v. Jones*, 143 N.H. 208, 211, 722 A.2d 478, 480

(1998) ("[T]he existence of a duty does not arise solely from the relationship between the parties,

but also from the need for 'protection against reasonably foreseeable harm.'" (quoting *Morvay*,

127 N.H. at 725, 506 A.2d at 334 (1986))).  The court further held that the plaintiff had an action

in contract as well, under a third-party beneficiary theory.  *Simpson*, 139 N.H at 7, 650 A.2d at

322-23 ("We hold that where, as here, a client has contracted with an attorney to draft a will and

the client has identified to whom he wishes his estate to pass, that identified beneficiary may

enforce the terms of the contract as a third-party beneficiary.").

Here, Butler Rubin and Baker Daniels contend that under the rule of *Simpson*, and because their alleged harm (the payment of fees on Shelton's behalf) was foreseeable, the Denby Parties owed them a duty of care in their representation of Shelton. *See Iannelli v. Burger King Corp.*, 145 N.H. 190, 194, 761 A.2d 417, 420 (2000) ("If the risk of injury [i]s reasonably foreseeable, then a duty exist[s]."). Specifically, they contend that it "is not a novel concept" that a law firm would be liable for the conduct of its partners, and that the Denby Parties therefore should have foreseen that any harm they caused to Shelton would also afflict her firms.

That argument, however, appears to be foreclosed by a more recent New Hampshire case that clarified the *Simpson* rule. In *MacMillan v. Scheffy*, 147 N.H. 362, 363, 787 A.2d 867, 868 (2001), an attorney drafted a deed enacting the sale of land from one family (the Toys) to another family (the Dicksons). The attorney had represented the Toys for approximately six years before the date of the sale, and he continued to represent them thereafter. *Id.* at 365, 787 A.2d at 869. In drafting the deed, he neglected to note a restrictive covenant that encumbered the land, and instead included warranty covenants that conflicted with the restrictive covenant. *Id.* at 363, 787 A.2d at 868. Once the Dicksons learned of the restrictive covenant, they sued the attorney for legal malpractice. *Id.* at 363, 787 A.2d at 868.

After the trial court directed a verdict for the Dicksons, the New Hampshire Supreme Court reversed. *Id.* at 365, 787 A.2d at 870. The court held that even though the attorney admitted that he "understood that the intended beneficiaries of the deed . . . were the Dicksons," he owed no duty of care to the Dicksons. *Id.* at 364-65, 787 A.2d at 869-70. It further stated that, as a general rule, "for a nonclient to succeed in a negligence action against an attorney, he must prove that the primary purpose and intent of the attorney-client relationship itself was to

benefit or influence the third party." *Id.* at 364, 787 A.2d at 869.  In other words, mere foreseeability of harm is not enough; an attorney has no duty to a third party unless benefitting or influencing that third party is "one of the motivating causes" in the formation of the attorney-client relationship.  *Id.* at 364-65, 787 A.2d at 869.

Here, the Denby Parties represented both Shelton (the trustee) and Betty (one of the beneficiaries).  But there is no dispute that Butler Rubin and Baker Daniels were never clients of the Denby Parties, and no evidence suggests otherwise.  Indeed, the November 6, 2007 engagement letter prepared by Denby and signed by Shelton makes no mention of the law firms.  Nor was the primary purpose of the representation to benefit the law firms.  Although Shelton billed the EMT Trusts for her services as trustee by sending invoices through the law firms, that fact tends to prove at most that the firms stood to benefit from Shelton's role as trustee and that it might have been reasonably foreseeable that they would be harmed by a surcharge.  It does not demonstrate that the "primary purpose and intent" of Denby's representation of Shelton was to benefit the firms.  *See id.* at 364.

For those reasons, the Denby Parties did not owe a duty of care to Butler Rubin or Baker Daniels in their representation of Shelton.  Accordingly, the motion by the Denby Parties for summary judgment as to the claims of those law firms will be granted.

### C.       The Denby Parties' Motion for Summary Judgment as to All Shelton Parties

The Denby Parties have separately moved for summary judgment as to the claims of all of the Shelton Parties.  They contend (1) that Denby did not breach her duty of care to Shelton; (2) that Shelton has no standing to bring her claim, because she has not personally incurred any damages; and (3) that Shelton's claims are barred by the doctrine of *in pari delicto*, because she

bore "at least substantially equal responsibility" for the negative outcomes in the New Hampshire litigation that led to her alleged damages.  The Court will address the latter two points first.[53]

### 1.    Shelton's Standing to Sue

"In evaluating whether a party has standing to sue, [th]e focus [is] on whether the party suffered a legal injury against which the law was designed to protect." *Libertarian Party of New Hampshire v. Sec'y of State*, 158 N.H. 194, 195, 965 A.2d 1078, 1080 (2008).  Put another way, the party must "demonstrate harm to maintain a legal challenge." *Id.* at 195-96, 965 A.2d at 1080.  Here the Denby Parties contend that Shelton cannot demonstrate harm, because her legal-malpractice insurance and her law firms have (concededly) combined to cover all of the fees and settlement costs for which she seeks reimbursement.

Under New Hampshire law, the fact that an alleged tort victim has received compensation from insurance (or other sources) does not normally prevent her from obtaining a full recovery from the tortfeasor.  *Carson v. Maurer*, 120 N.H. 925, 939, 424 A.2d 825, 835 (1980), *overruled on other grounds by Comm'y Resources for Justice, Inc. v. City of Manchester*, 154 N.H. 748, 762, 917 A.2d 707, 721.  That rule is known as the "collateral source rule." *Id.* at 939, 424 A.2d at 835; *Law v. Griffith*, 457 Mass. 349, 355 (2010).  It "has been applied to benefits paid under an insurance policy" as well as "employment benefits[ and] gratuitous payments," among others.  *Moulton v. Groveton Papers Co.*, 114 N.H. 505, 509, 323 A.2d 906, 909 (1974).

---

[53] The W&M Parties have expressly joined in raising the issues of standing and *in pari delicto*.  Because the relevant arguments are primarily set forth in the memoranda supporting the motion by the Denby Parties, the Court will discuss the doctrines in conjunction with their motion.

The Denby Parties contend that the collateral source rule should not apply under these facts, because Shelton "has not paid a single penny in relation to any of her alleged damages." (Denby Rep. at 5).  They cite to *Ohio Cent. R.R. Sys. v. Mason Law Firm Co., L.P.A.*, 182 Ohio App. 3d 814, 823, 915 N.E.2d 397, 404 (2009), a legal-malpractice case in which another state court held that "the collateral-source rule ha[d] no application."  In that case, the plaintiff's insurer had paid for all but $100,000 of the plaintiff's alleged losses, and the lower court had restricted the plaintiff's recovery to that $100,000.  *Id.* at 820, 915 N.E.2d at 402.  On appeal, the Ohio Court of Appeals affirmed that ruling, holding that "the insurer [wa]s the sole real party in interest with respect to the amounts it paid pursuant to its contract with the insured."  *Id.* at 824, 915 N.E.2d at 405.[54]

If this case were governed by Ohio law, Shelton might not be able to recover for any fees that have been paid by her insurer.  But there is no reason to believe that New Hampshire would adopt the same approach as Ohio, which does not appear to employ the collateral source rule. Indeed, the New Hampshire Supreme Court has struck down a statute that purported to abolish the collateral source rule in medical malpractice cases; the rule currently remains in full effect in all tort actions.  *Carson*, 120 N.H. at 946, 424 A.2d at 839; *see Cyr v. J.I. Case Co.*, 139 N.H. 193, 195, 652 A.2d 685, 688 (1994); Bryce Benjet, *A Review of State Law Modifying the Collateral Source Rule:  Seeking Greater Fairness in Economic Damages Awards*, 76 DEF.

---

[54] In Ohio, a statute allows a defendant in a tort action to "introduce evidence of any amount payable as a benefit to the plaintiff as a result of the damages" alleged in the action, subject to certain exceptions.  Ohio Rev. Code Ann. § 2315.20.

COUNS. J. 210, 228 (2009).[55]

Accordingly, the Court will not grant summary judgment on the ground that Shelton is without standing to sue.

## 2. Collateral Estoppel and *In Pari Delicto*

The Denby Parties next contend that the combination of two doctrines—collateral estoppel and *in pari delicto*—bars Shelton from recovering based on any alleged negligence of Denby.

"For collateral estoppel to apply, three basic conditions must be satisfied: (1) the issue subject to estoppel must be identical in each action; (2) the first action must have resolved the issue finally on the merits; and (3) the party to be estopped must have appeared as a party in the first action, or have been in privity with someone who did so." *Ojo v. Lorenzo*, 164 N.H. 717, 725, 64 A.3d 974, 981 (2013) (quoting *Stewart v. Bader*, 154 N.H. 75, 80-81, 907 A.2d 931, 937 (2006)). Those conditions "must be understood, in turn, as particular elements of the more general requirement, that a party against whom collateral estoppel is pleaded must have had a full and fair opportunity to litigate the issue or fact in question." *Stewart*, 154 N.H. at 81, 907 A.2d at 937. The party asserting a defense of collateral estoppel need not have been a party in the prior action. *Cutter v. Town of Durham*, 120 N.H. 110, 111, 411 A.2d 1120, 1121 (1980) ("[U]nder the doctrine of collateral estoppel, it is not essential that there be mutuality of the parties. A party who, after full litigation, has lost on an issue is thereafter barred from litigating

---

[55] The New Hampshire Supreme Court has stated that the collateral-source rule could allow a plaintiff to recover "the full value of the services" that were necessitated by the alleged injury, even if that value exceeds the amount that was actually charged for those services. *See Lefebvre v. Gov't Emp. Ins. Co.*, 110 N.H. 23, 25, 259 A.2d 133, 135 (1969) (noting that a plaintiff who paid $31.50 for services worth $918 would be entitled to recover $918 and "in the absence of a subrogation agreement or assignment would be able to keep the full amount recovered"); *see Reed v. Nat'l Council of Boy Scouts of Am., Inc.*, 706 F. Supp. 2d 180, 192 (D.N.H. 2010).

the issue with new parties." (citations omitted)).

Here, the three conditions of collateral estoppel appear to be satisfied with respect to the discrete issue of Shelton's bad faith:  (1) the issue is identical in both this proceeding and the earlier proceeding; (2) the issue was resolved "finally on the merits" in the New Hampshire litigation, as the probate court's ruling was affirmed by the state supreme court; and (3) Shelton was as a party in that action.   Accordingly, Shelton "had a full and fair prior opportunity to litigate the issue" of whether she acted in bad faith, and the doctrine of collateral estoppel applies. *See Stewart*, 154 N.H. at 81, 907 A.2d at 937.

The doctrine of *in pari delicto* (meaning "in equal fault") is aimed at "prohibit[ing] plaintiffs from recovering damages resulting from their own wrongdoing." *Nisselson v. Lernout*, 469 F.3d 143, 151 (1st Cir. 2006).  The doctrine applies where "(i) the plaintiff, as compared to the defendant, bears at least substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit would not interfere with the purposes of the underlying law or otherwise contravene the public interest."  *Id.* at 152 (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310-11 (1985)).

> In its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because in cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt.  Thus there might be an inequality of condition between the parties, or a confidential relationship between them that determined their relative standing.

*Bateman*, 472 U.S. at 307 (internal citations and quotations omitted).

In *Witte v. Desmarais*, 136 N.H. 178, 187, 614 A.2d 116, 120 (1992), the New Hampshire Supreme Court considered the doctrine in the context of a legal-malpractice claim by

a former client against an attorney.  The client contended that the attorney had advised him not to

mention (that is, to lie about) a $4,000 cashier's check during a divorce hearing; the attorney

allegedly recanted his advice during the cross-examination of the client, to the client's

disadvantage.  136 N.H. at 186, 614 A.2d at 119-20.  In the subsequent malpractice suit, the

attorney contended that the doctrine of *in pari delicto* prevented the client from recovering for

any damages caused by the attorney's advice concerning the check, because if the client took the

advice, he committed perjury and should not be permitted to benefit from his wrongdoing.  *Id.*

The court called the defense "persuasive" in that context, but declined to apply it at the motion to

dismiss stage because "the pleadings d[id] not clearly establish that [the plaintiff] in fact

committed perjury or intentionally misled the court."  *Id.* at 187, 614 A.2d at 120.  *See also*

*Pantely v. Garris*, 180 Mich. App. 768, 773-78, 447 N.W.2d 864, 867-69 (1989) (applying the

defense in claim for legal malpractice where the client admitted committing perjury); *Evans v.*

*Cameron*, 121 Wis.2d 421, 360 N.W.2d 25 (1985) (same).

In *Evans*, the Wisconsin Supreme Court observed (albeit in dicta) that while the

application of the doctrine might be clear in simple cases, such as perjury by the client, it might

not be appropriate in all cases involving client wrongdoing:

> There may be circumstances in which the advice given by an attorney is so complex that
> the client would be unaware of the wrongfulness involved in following that advice.  In
> such circumstances, more weight may be given to the influence an attorney will have
> over the client and the amount of reliance which the client can justifiably place in the
> attorney.  The wrongfulness of lying under oath, however, is apparent.

121 Wis.2d at 428, 360 N.W.2d at 28-29.  The Michigan Court of Appeals made a similar

observation in *Pantely*:

> We can readily envision legal matters so complex and ethical dilemmas so profound that
> a client could follow an attorney's advice, do wrong[,] and still maintain suit on the basis

of not being equally at fault.  But perjury is not complex; and telling the truth poses no dilemma.

180 Mich. App. at 776, 447 N.W.2d at 868.

Here, the Denby Parties contend that (1) because Shelton was found to have acted in bad faith, and (2) because that factual determination is deemed final by reason of collateral estoppel, then (3) her claims for legal malpractice are necessarily barred by the *in pari delicto* doctrine. But even accepting the first two premises, it is by no means clear that she should bear "substantially equal responsibility" to Denby (or any of her other counsel) for causing the probate court's adverse ruling in the New Hampshire litigation.

First, this matter is far from simple.  Shelton was not counseled to, and did not, commit perjury.  Nor did she embezzle client funds, commit fraud, or undertake any similar act of obvious moral turpitude.  The wrongfulness of her conduct, even accepting the conclusions of the probate court, arose in the context of a complex legal matter, and is not apparent to any person who is not well-grounded in the facts and the applicable law of trusts and fiduciaries.

Furthermore, the essence of Shelton's claim is that the probate court's finding of bad faith was the direct product of the legal malpractice.  According to Shelton, the substandard legal advice that she received put her in the dangerous position of serving as a trustee, and prosecuting litigation on behalf of a single beneficiary, without an appropriate understanding of her duties and obligations and without knowledge of the potential risks.  She further contends that because of the conflicting loyalties of counsel, she could not effectively defend herself in the New Hampshire litigation.

Whether she can prove those claims or not, the relative culpability of Shelton and her attorney-advisors is far from clear.  All parties seem to agree that the probate court's finding of

bad faith and imposition of the surcharge was an unprecedented, indeed surprising, result.  If

nothing else, the wrongfulness of Shelton's conduct was not so "apparent" that her claims should

be precluded as a matter of law.  *Cf. Evans*, 121 Wis.2d at 428, 360 N.W.2d at 28-29 (finding

that "the wrongfulness of lying under oath is apparent").

Under the circumstances, the Court cannot conclude, as a matter of summary judgment,

that Shelton bore "substantially equal responsibility" to Denby or any other attorney.  The Court

will therefore deny the motion of the Denby Parties for summary judgment to the extent that they

rely on the doctrine of *in pari delicto*.

### 3.        The Merits of Shelton's Negligence Claim Against Denby

The Shelton Parties contend that Denby breached her duty of care to Shelton by (1)

failing to warn her of the extent to which serving as Betty's trustee, and specifically pursuing an

aggressive course of litigation on Betty's behalf, could expose her to personal liability, and (2)

failing to recognize and advise her that a potential conflict between her interests and Betty's

interests might arise (or had arisen) and that she should therefore obtain independent counsel.

The parties appear to agree that the outcome of the New Hampshire litigation represented

a worst-case scenario for Betty and Shelton.  Not only was the *in terrorem* clause enforced

against Betty, costing her millions of dollars as a beneficiary of the EMT Trusts, but the probate

court also held Shelton personally liable for the respondents' attorneys' fees and costs.  The

court expressly based the order against Shelton on its finding that she had acted in bad faith in

connection with her "actions and conduct in relation to the[] endeavor to sever Betty and her

progenies' beneficial interests from those of her siblings and their issue in contradiction of what

her father envisioned and implemented for them."  (Clarification of Order on Remand from

71

Appeal at 2, N.H. Litigation (Sep. 5, 2012)).  As a consequence of the probate court's rulings, the Shelton Parties have paid $1.5 million to settle their exposure for legal fees in the New Hampshire litigation, $750,000 to settle Shelton's surcharge liability, and $2.15 million in direct attorneys' fees in connection with the appeal of the probate court's ruling and the defense of Betty's claims in this court.

The claims of the Shelton Parties for failure to warn of her exposure to personal liability and for failure to warn her of a conflict of interest are necessarily intertwined, particularly as to issues of causation and injury.  Nonetheless, for analytical purposes, the Court will consider the breach of duty claims separately.

### a.      The Duration of Denby's Representation

A threshold issue that must be addressed before considering the question of breach of duty is whether Denby's representation of Shelton terminated before the trial.  There does not appear to be any dispute that Denby and Shelton were in an attorney-client relationship from 2007 onward.  Nonetheless, there is a dispute as to when that relationship ended.  Denby purportedly withdrew from the representation of both Betty and Shelton before the trial testimony, citing unpaid legal bills totaling $187,997.85.  She sent a letter to Betty and Shelton to that effect on October 19, 2009.  (Dkt. No. 182, Ex. 99).  The New Hampshire trial began on November 30, 2009.  On that basis, the Denby Parties contend that Denby cannot be held liable for any conduct or omissions that took place after October 19, 2009, as the attorney-client relationship with Shelton no longer existed.

It is true that the letter purported to end the relationship.  Nonetheless, there is evidence that Denby continued to serve as counsel to Betty and Shelton.  For example, Shelton testified

that Denby "occasionally" received "reports as to what was happening during the trial" and

responded to questions.  (Shelton Dep. at 714).  She also testified that Denby was "really

directing a lot of the substance of the litigation," including during the trial.  (*Id.* at 216-17).

When Denby testified at the trial on December 2, 2009, she was asked by McIntyre:  "And have

you played a role in this litigation?"  (Trial Tr. at 388, 398, N.H. Litigation (Dec. 2, 2009)).

Denby responded in the present tense:  "I act as fiduciary counsel to assist the litigation team,

and also to assist the trustee."  *Id.*[56]

For the month of December 2009, Burke, Warren billed 52.55 hours to the matter of

Betty's trust administration, of which 41.75 hours were incurred by Denby.  (Denby Billing

Records at 285-86).  Denby spent 28 hours on December 1, 2, and 3, either on "trial and

testimony preparation" or "attend[ing] trial."  She recorded more than a dozen hours for matters

such as "conference with Julie Shelton and Betty Tamposi" regarding a "potential settlement"

and "[r]esearch on remedy."  (*Id.*).  Denby also appears to have billed 6.0 hours to the matter in

January 2010, with another 5.5 hours billed by other Burke, Warren attorneys.  (*Id.* at 290-91).

There is, accordingly, evidence that Denby was still providing advice to Shelton, even if her

advice only sporadically extended to matters relating to the trial.

Denby's participation was clearly limited.  The billing records reflect that she spent less

than four hours discussing litigation-related matters with Shelton in December 2009.[57]

---

[56] At McIntyre's deposition, she testified that as far as she knew, Denby was still engaged as counsel to both Betty and Shelton as of the time of her trial testimony and throughout the trial.  (McIntyre Dep. at 147).

[57] The records show 2.5 hours billed on December 11, 2009, for "[c]onference with Betty Tamposi and Julie Shelton regarding trial status and conference with Michael Weisman regarding trust administration and chronology of prior litigation" and 1.5 hours billed on December 15, 2009, for "[p]repar[ing] calculation for potential settlement[ and c]onference with Julie Shelton and Betty Tamposi regarding same."  (Denby Billing Records at 285-86).

Furthermore, the parties have agreed that she was only physically present at the trial during her own testimony.  (Resp. to Denby SMF ¶ 111).  That necessarily means that Denby did not view at least some of Betty's testimony, which took place over several days.  Indeed, Shelton testified that after Betty gave the damaging testimony, she discussed it with Weisman, her trial counsel, rather than Denby.

Nonetheless, there is a dispute of fact as to whether Denby and Shelton continued to have an attorney-client relationship that continued at least during the period of Betty's trial testimony in late November and early December 2009, and in the days and weeks immediately following that testimony.   (Shelton Dep. at 846-48).  Furthermore, and in any event, the trial was simply the culmination of events that had been set in motion more than two years earlier—specifically, the filing of the complaint in October 2007 and the conduct of the litigation from that point forward.  For those reasons, to the extent that claims of malpractice against Denby are based in part on events occurring after October 19, 2009, they will not be dismissed on summary judgment.

**b.** **Breach of Duty:  Failure to Warn of Personal Risks**

The Shelton Parties contend that Denby negligently failed to warn Shelton that by pursuing an aggressive course of litigation on behalf of Betty, she risked personal liability, principally in the form of a surcharge and an award of attorneys' fees.  In order to prevail on that claim, they must prove both (1) that Denby's alleged failure to warn was a breach of her duty of care and (2) that the breach "legally caused" her harm.  *See Yager*, 166 N.H. at 572-73, 101 A.3d at 9.  Conversely, in order to succeed in their motion for summary judgment, the Denby Parties must demonstrate that the Shelton Parties have put forth insufficient evidence to create a material

question of fact on either the breach issue or the causation issue.

The Shelton Parties have submitted an affidavit and expert report of Keith Bradoc Gallant. (Dkt. No. 208). According to his affidavit, Gallant has been a Fellow of the American College of Trust and Estate Counsel ("ACTEC") since 1993 and is currently a member of its Fiduciary Litigation Committee and its Elder Law Committee. (Gallant Rep. ¶ 4). He is also the former president of the Connecticut Bar Association and the former chair of the Connecticut Bar Association Estates and Probate Section. (*Id.* ¶ 3).

In his report, Gallant states: "From the beginning of her joint representation of [Betty Tamposi and Shelton], Attorney Denby showed virtually no concern about the inherent potential conflicts of interest between her two clients." (*Id.* ¶ 17).

> Denby made no effort to educate Shelton about the personal risks she would incur just by serving as Trustee (one who was about to undertake highly contested litigation with uncertain results) let alone the added risk of being represented by an attorney whose loyalty to a litigious beneficiary was clear.

(*Id.* ¶ 20). He similarly states that "from her earliest interactions with Julie Shelton as a client and a Trustee[,] Stephanie Denby failed to apprise Shelton of the true nature of the path upon which Shelton, at Denby's urging, had embarked." (*Id.* ¶ 22).

Gallant also concludes that Denby breached her duty to Shelton by "failing to explain to her fiduciary client the significance of rejecting th[e] alternative" of filing a petition for instructions instead of initiating litigation. (*Id.* ¶ 23). He states:

> Shelton should have been told by her attorney that acquiescing in the beneficiary client's demand for a far more aggressive approach to, and a higher risk in, the litigation would increase the level of potential *personal* liability for the Trustee. There is a fundamental and irrevocable conflict between (a) the interest of a beneficiary set on challenging the conduct of certain fiduciaries designated by the terms of a trust (as well as in maximizing her individual receipts from the Trust assets, potentially in derogation of the interests of other beneficiaries) and (b) the

interest of a fiduciary whose every discretionary act places her at risk of a
surcharge by the Court.

(*Id.*).

Gallant goes on to state:

As the litigation advanced, and especially in the light of Judge Cassavechia's
announced intention of considering a surcharge against Trustee Shelton, the need
for separate counsel only became more obvious.  Yet Denby apparently never
raised the issue of separate representation with Shelton.  The explanation for this
extraordinary lapse has profound consequences since it contributed directly to
Denby failing to provide Shelton, not only with the expert guidance and advice
she had promised, but even with the minimal level necessary to satisfy the
standard of care.

(*Id.* ¶ 24).

Gallant further concludes that, for Denby, "[a]t each stage of the litigation and the

preceding events it [wa]s [Betty]'s goals that were the driving force, always without regard to the

potential consequences to Shelton."  (*Id.* ¶ 25).[58]

Gallant specifically addresses Denby's failure to advise Shelton of the possibility of a

surcharge (*Id.* ¶¶ 14, 26) and the imposition of attorney's fees (*Id.* ¶¶ 13, 26).   He states:

While Attorney Denby may assert she perceived these risks as remote, in fact they
were either raised directly by Judge Cassavechia (surcharge) or specifically
authorized by the newly enacted uniform law (attorney[']s fees).  Thus they were
not merely remote theoretical risks that reasonably could be ignored by trust
counsel. A fair reading of Judge Cassavechia's ruling on the requested
disbursements makes clear that the Court was prepared to take draconian steps if
it found the "very serious issues" raised by the respondents to be accurate.  The
Judge was quite clearly issuing a warning that he would not tolerate a perceived
abuse of fiduciary discretion.  However, Denby advised Shelton that she did not
need to be concerned about a surcharge risk, and instead encouraged Shelton to
continue presenting herself as wholly in support of Tamposi.  As a result of

---

[58] In addition to the specific instances of negligence detailed above, Gallant also states that Denby breached
her duty to Shelton by failing to advise her of the potential consequences of (1) sending the September 7, 2007 letter
asking Sam and Steve to provide Betty with $2 million within seven days, (2) including the prayers for relief in the
initial and amended New Hampshire complaints, and (3) failing to resign as trustee.  (Gallant Rep. ¶ 25).

Denby's conduct in this regard the [j]udge concluded that Shelton's acts were
willful and collusive.

(*Id.* ¶ 26) (footnotes and citations omitted).

His report concludes:  "Having failed to secure a corporate fiduciary for her beneficiary

client Elizabeth Tamposi, Denby secured the services of an individual fiduciary who, although

an attorney, was known to be a complete novice in the field of trusts.  Denby then sent her

fiduciary client into what any experienced trust lawyer would know were going to be extremely

adversarial, high risk proceedings, effectively without representation of Julie Shelton's separate

personal and fiduciary interests."  (*Id.* ¶ 27).[59]

For the reasons set forth below, a reasonable jury could credit the conclusions of Gallant

that Denby's specific failures to advise Shelton of the possibility of a surcharge or attorney's

fees constituted a breach of duty.  More generally, the jury would be entitled to credit Gallant's

opinion that Denby should have educated Shelton about the "personal risks" she would incur

"just by serving" as a trustee, even if the specific source or nature of any particular risk may

have been somewhat unclear at the beginning of the representation.  (*See* Gallant Rep. ¶¶ 20, 27).

### i.     Surcharge

Gallant addresses the specific issue of surcharge liability as follows:

Although in the broad range of fiduciary litigation a surcharge is rarely invoked
by a [c]ourt, . . . [w]hen a [c]ourt does impose a surcharge it will inevitably be
payable by the fiduciary personally, not from [t]rust assets.  Thus an individual
fiduciary engaged in a trust dispute needs to understand that a surcharge is a
potential risk to his or her personal assets.  This is not a self-apparent risk and any
fiduciary representation in a contested matter needs to consider this issue.  In [this
case] there was a foreseeable risk that the [p]robate [c]ourt might impose a

---

[59] Gallant contends that "it appears that Denby actually may have misled Shelton about the reasons the
corporate fiduciaries that were approached declined to serve."  (Gallant Rep. ¶ 21).  The evidence appears to be in
conflict as to that issue, and therefore the issue will not be resolved on summary judgment.

surcharge and once the [j]udge himself indicated that he would consider doing so
the likelihood significantly increased.

(*Id.* ¶ 14).

There is no evidence that Shelton was warned of the possibility of surcharge liability

before the issuance of the probate court's December 2008 order.  That order stated, among other

things, that the trial court "has equitable power to surcharge the trustee if there is a later

determination that she has acted improperly in the prosecution of this litigation or in making

disbursements."  Order at 6-7, N.H. Litigation (Dec. 3, 2008).  Shelton testified at her deposition

that although the December 2008 order informed her that she could be surcharged, she lacked a

full understanding of what that meant.  (Shelton Dep. at 924).[60]

Shelton further testified that after reading the December 2008 order she spoke to her

counsel, including Denby.  According to Shelton, they "were very reassuring about the fact that a

surcharge was not going to happen because everything was appropriate and proper."  (Shelton

Dep. at 816).  The Denby Parties contend that, even accepting that description of Denby's

conduct, it could not constitute a breach of her duty to Shelton, because it represented only the

expression of her genuine assessment of the case.  In other words, according to the Denby

Parties, because Denby reasonably believed that none of Shelton's conduct was improper, her

advice fairly informed Shelton of the level of risk as she perceived it.

In his expert report, Gallant states that the likelihood of a surcharge "significantly

increased" as a result of the probate court's 2008 order.  (Gallant Rep. ¶ 20).  He further states

that the order "ma[de] clear that the [c]ourt was prepared to take draconian steps" and that "[t]he

_____

[60] It is noteworthy that the complaint filed in the New Hampshire litigation on October 12, 2007, sought (as the second prayer for relief) a "surcharge" against Sam and Steve.  (N.H. Compl. at 14-15).  In all likelihood, Shelton had become at least somewhat familiar with the term by that point.

[j]udge was quite clearly issuing a warning that he would not tolerate a perceived abuse of fiduciary discretion." (*Id.* ¶ 26). He then suggests (although does not state directly) that Denby breached her duty to Shelton by failing to inform her of the increased risk. (*Id.*).

In general, "[i]t is neither fair, practical, nor legally appropriate to benchmark an attorney against a standard of prescience." *Sierra Fria Corp. v. Donald J. Evans, P.C.*, 127 F.3d 175, 182 (1st Cir. 1997) (applying Massachusetts law). "[A]n attorney is not liable for an error in judgment concerning a proposition of law that is debatable, uncertain, unsettled, or tactical." RONALD E. MALLEN & ALLISON MARTIN RHODES, 4 LEGAL MALPRACTICE § 33:15 (2015).

Nonetheless, taken as a whole, the evidence is sufficient to support a finding that Denby breached her duty of care by failing to warn of the potential for a surcharge. Gallant has provided an expert opinion that Shelton should have been warned about the possibility of personal liability before undertaking any litigation at all, much less aggressive litigation. And he has opined that the December 2008 order signaled a shift in the probate court's thinking and "significantly increased" the risk of surcharge. (Gallant Rep. ¶ 20). Although it would not have to do so, a jury would be permitted to credit that testimony. A jury would likewise be entitled to credit Shelton's testimony that she did not "understand what could be encompassed within a surcharge" even after talking to Denby. (Shelton Dep. at 924). A reasonable jury could thus permissibly find that Denby breached her duty of care with respect to her advice on the issue of surcharge.

### ii.     **Attorneys' Fees**

The fee-shifting statute, N.H. Rev. Stat. Ann. § 564-B:10-1004, was enacted by the New Hampshire legislature in 2004 as part of the adoption of the Uniform Trust Code. According to

Gallant, it was therefore "quite recent legislation." (Gallant Rep. ¶ 13). He states that it is "essential for all counsel representing a fiduciary in the type of litigation presented by *Shelton*" to consider "what novel issues might arise," including the possibility of "new, and very real, risks for parties in fiduciary litigation." (*Id.*). He also states that the newness of the statute made its application far less "predictable," thereby further increasing the risk to Shelton. (*Id.*). He further opines that "there was a foreseeable risk that the [statute] might lead to a fee award against Ms. Shelton as a party." (*Id.*).

The Denby Parties contend that no reasonable jury could find that Denby breached her duty of care with respect to the issue of attorneys' fees, because the risk to Shelton in her personal capacity was too remote to require any warning beyond that which Denby gave. They note that the statute had never previously been interpreted or applied by any New Hampshire court and that it did not clearly state that a trustee could be held personally liable.[61]

It is undisputed that Judge Cassavechia's order finding that Shelton acted in bad faith and holding her personally liable came as a surprise to all parties in this action. Shelton herself argued on appeal that there was "no precedent for holding a trustee *personally* liable to pay attorneys' fees in a situation where . . . she sued only in her capacity as [t]rustee, . . . the principal trust beneficiary joined as a petitioner in the suit," and all other beneficiaries (plus a guardian ad litem representing the unborn beneficiaries) supported the suit. (Appellant Br. at 45-46, *Shelton v. Tamposi*, 164 N.H. 490, 62 A.3d 741 (2013) (No. 2010-634)). Although that

---

[61] The Denby Parties also note that the statute states: "In a judicial proceeding involving the administration of a trust, the court . . . may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by *another party* . . . ." N.H. Rev. Stat. Ann. § 564-B:10-1004. Because Shelton was not a party to the New Hampshire litigation in her personal capacity, the Denby Parties contend that it was not foreseeable that she would be held personally liable for attorneys' fees pursuant to the statute.

argument was rejected, the New Hampshire Supreme Court confirmed in its decision that the probate court's decision lacked at least appellate precedent. *Shelton v. Tamposi*, 164 N.H. at 501, 62 A.3d at 751 (2007) ("We have not yet construed the specific language of [N.H. Rev. Stat. Ann. §] 564-B:10-1004."). Thus, given the legal landscape at the time, and the belief of the parties that Shelton had not acted in bad faith, the Denby Parties argue that her failure to mention the New Hampshire fee-shifting statute could not have constituted malpractice.

However, it is not the Court's role on summary judgment to assess the relative credibility of expert testimony. Gallant has stated that the risk that the statute would be applied was foreseeable. In fact, he further stated that the lack of precedent relating to the statute actually increased the risk to Shelton, because the range of possible interpretations was greater than it otherwise would be. (Gallant Rep. ¶ 13 ("When statutes have been construed and applied by [c]ourts in a given jurisdiction over a period of decades the results are far more predictable than when they are relatively recently enacted. The latter situation creates the opportunity for precisely what occurred in [this case].")). A jury could reasonably credit that testimony, and on that basis could find that Denby breached her duty of care to Shelton by failing to advise her of the existence of the fee-shifting statute and the risk it could pose to her.

The Court further notes that the jury would be entitled to credit Gallant's more general opinion that Denby had an obligation to advise Shelton of the "personal risks she would incur just by serving as [t]rustee." (Gallant Rep. ¶ 20). Those personal risks derived from a variety of sources, including the possibility of a surcharge or application of the fee-shifting statute.[62] Put

---

[62] There was a third possibility, as well: the common-law bad-faith exception to the American rule that both sides must pay their own attorneys' fees. Indeed, in its clarification order, the probate court explicitly stated that "[t]he award of fees was premised on both New Hampshire statutory and common laws" and cited to both § 564-B:10-1004 and *In re Mallett*, 163 N.H. 202, 211-12, 37 A.3d at 340 (2012)), a New Hampshire case that recited

another way, a reasonable jury could conclude that the possibility of personal risk, taken as a

whole, was greater than the possibility of risk arising from any one particular source.  Under the

circumstances, summary judgment for either party as to the failure to warn of the possibility of

personal liability is not warranted.

> c.  **Breach of Duty:  Failure to Advise as to Potential Conflict of Interest**

The Shelton Parties also contend that Denby committed malpractice by failing, at various

points, to advise Shelton of the desirability of obtaining independent counsel.  In his report,

Gallant states:

> It is not always improper for a lawyer simultaneously to represent both a fiduciary and a beneficiary in trust litigation, although it can be exceptionally challenging to do so.  Generally, the more contested the matter the less likely the joint representation will be acceptable to the clients or to the lawyer.  In all the circumstances experienced trust counsel should have been reluctant, even initially, to undertake a joint beneficiary-fiduciary representation in *Shelton*.  Such a representation became exceedingly problematic after Judge Cassavechia's Order of December 3, 2008[,] and clearly impossible after [Betty]'s subsequent trial testimony . . . .  Yet Denby apparently never raised the issue of separate representation with Shelton.  The explanation for this extraordinary lapse has profound consequences since it contributed directly to Denby failing to provide Shelton, not only with the expert guidance and advice she had promised, but even with the minimal level necessary to satisfy the standard of care.

(Gallant Rep. ¶¶ 16, 24).  Gallant also opines that Denby's failure to recommend separate

counsel while pursuing an aggressive litigation strategy was "problematic."  (*Id.* ¶ 23).  Thus, in

substance, Gallant states that the joint representation should have been undertaken

"reluctant[ly]" in the first instance; had become "problematic" by the time the original New

Hampshire complaint was filed in October 2007; had become "exceedingly problematic" after

---

the common-law bad-faith exception.  Shelton acknowledged that she was aware of the rule.  (Shelton Dep. at 708-09, 788-89, 817).

the probate court order in December 2008; and was "clearly impossible" after Betty's testimony in November and December 2009.

Gallant cites Rule 1.7 of the Model Rules of Professional Conduct for the proposition that where a potential joint representation would present "a significant risk" to the representation of either client, a lawyer should only take on that joint representation if she "reasonably believes" that she "will be able to provide competent and diligent representation to each affected client" and "each affected client gives informed consent, confirmed in writing." (*Id.* ¶ 19).[45]  He further states that "it was impossible for Attorney Denby to 'reasonably believe' she had obtained 'informed consent'" from Shelton to represent her and Betty jointly, because she "made no effort to educate Shelton about the personal risks she would incur just by serving as [t]rustee (one who was about to undertake highly contested litigation with uncertain results) let alone the added risk of being represented by an attorney whose loyalty to a litigious beneficiary was clear." (*Id.* ¶ 20).[46]

Gallant also states that the joint representation had become "even more problematic" by the time of the filing of the Massachusetts lawsuit (in September 2007) and the New Hampshire lawsuit (in October 2007).

> While the initial joint representation by Attorney Denby does not comport with the standard of care required in the circumstances, Denby's subsequent failures to recommend that Trustee Shelton obtain separate counsel are even more problematic.  That Denby suggested a petition for instructions would be safer and

---

[45] Of course, Shelton is herself a lawyer, and therefore is presumably aware of Rule 1.7.

[46] Gallant's suggestion that the risks to Shelton were even greater because she was accepting joint representation from "an attorney whose loyalty to a litigious beneficiary was clear" may not accurately describe the situation as of August 2007, when Shelton agreed to become trustee. (*See* Gallant Rep. ¶ 20).  Indeed, Denby had initially been recommended to Betty by Shelton, who knew her as "somebody who [she] respect[ed] highly as a trust and estates lawyer."  (Shelton Dep. at 22).  The question of Denby's loyalties cannot, however, be resolved on summary judgment.

less costly to pursue does not absolve her from failing to explain to her fiduciary client the significance of rejecting this alternative. Shelton should have been told by her attorney that acquiescing in the beneficiary client's demand for a far more aggressive approach to, and a higher risk in, the litigation would increase the level of potential personal liability for the Trustee. There is a fundamental and irrevocable conflict between (a) the interest of a beneficiary set on challenging the conduct of certain fiduciaries designated by the terms of a trust (as well as in maximizing her individual receipts from the Trust assets, potentially in derogation of the interests of other beneficiaries) and (b) the interest of a fiduciary whose every discretionary act places her at risk of a surcharge by the Court.

(Gallant Rep. ¶ 23). Gallant thus describes not only how Denby breached her duty (by failing to recommend that Shelton obtain or consider obtaining separate counsel notwithstanding the "fundamental and irrevocable conflict"), but also what she should have done to fulfill that duty (tell her that "acquiescing in [Betty]'s demand for a far more aggressive approach to, and a higher risk in, the litigation would increase the level of potential personal liability" for her.

Gallant further states that Denby's joint representation of Betty and Shelton "became exceedingly problematic after Judge Cassavechia's [o]rder of December 3, 2008." (*Id.* ¶ 16). He noted: "The [j]udge was quite clearly issuing a warning that he would not tolerate a perceived abuse of fiduciary discretion. However, Denby advised Shelton that she did not need to be concerned about a surcharge risk, and instead encouraged Shelton to continue presenting herself as wholly in support of [Betty]." (*Id.* ¶ 26). Finally, Gallant states that the joint representation had become "clearly impossible" after Betty's trial testimony. (Gallant Rep. ¶ 16). According to the Shelton Parties, that testimony left Betty "exposed as a liar." (Shelton Opp. at 20).[47]

---

[47] Betty testified in the New Hampshire trial over a period of several days from late November to early December 2009. All the parties to this action appear to agree that her testimony proved damaging to her and Shelton's case. Among other things, facts came out on her cross-examination that undercut her credibility, including her apparent untruthfulness about Samuel's intentions, how much money she had been receiving from the EMT Trusts (and how she had been spending the money she did receive), and how she answered certain questions on a loan application submitted to Sovereign Bank.

Taken as a whole, that evidence is sufficient to establish a breach of duty by Denby based on the failure to provide appropriate advice as to the dangers of joint representation, both in the first instance and at various points as events unfolded.

### d.    Causation

In order to prevail, the Shelton Parties must also prove that any alleged breach was the proximate or legal cause of her injury.  *See Yager*, 166 N.H. at 572-73, 101 A.3d at 9.  More specifically, "the failure to advise must have been necessary to produce the plaintiff's subsequent harm, without which the harm would not have occurred, and the failure must have been a substantial factor, rather than a slight one, in producing it."  *Bruckner*, 131 N.H. at 548, 563 A.2d at 434.

As noted, under New Hampshire law, "in most instances, expert testimony is required to prove causation in a legal malpractice action."  *Carbone v. Tierney*, 151 N.H. 521, 528, 864 A.2d 308, 315 (2004); see  *Yager*, 166 N.H. at 570, 101 A.3d at 9; *Estate of Sicotte v. Lubin & Meyer*, 157 N.H. 670, 674, 959 A.2d 236, 240 (2008).  "Unless the causal link is obvious or can be established by other evidence, expert testimony may be essential to prove what the lawyer should have done."  *Carbone*, 151 N.H. at 528, 864 A.2d at 315 (quotation and citation omitted).  "[E]xpert testimony on proximate cause is required in cases where determination of that issue is not one that lay people would ordinarily be competent to make."  *Id.*  "[T]he trier of fact must be able to determine what result would have occurred if the attorney had not been negligent."  *Id.*

The expert testimony here as to causation is thin at best.  The only direct statement in Gallant's report concerning causation as to Denby is that "[a]s a result of Denby's conduct in this regard the [j]udge concluded that Shelton's acts were willful and collusive."  (Gallant Rep. ¶ 26).

Beyond that conclusory assertion, there is little explanation as to how Denby's alleged malpractice (her failure to provide appropriate advice) was the proximate cause of Shelton's injuries (the imposition of personal liability).

Nonetheless, that is not necessarily fatal to the malpractice claim against Denby.  To the extent there are gaps in Gallant's report, they may be filled to some extent by Shelton's testimony and by reasonable inferences that lay jurors would be competent to make.

For example, Gallant opines that Denby had "overcome Shelton's initial refusal to serve as trustee" by making "quite extravagant promises" that "could not be, and were not fulfilled" given the joint representation.  (Gallant Rep. ¶ 18).  He further opines that "a clearly reluctant Julie Shelton would almost certainly not have agreed to a joint representation with Elizabeth Tamposi if Stephanie Denby had provided her with the information and knowledge necessary to give 'informed consent.'"  (*Id*. ¶ 20) (footnote omitted).  That advice, according to Gallant, should have included a discussion of the risk of personal liability.  At her deposition, Shelton testified that "I think if I had understood what the risks were to me personally, I would never have become trustee."  (Shelton Dep. at 832).  Obviously, if Shelton had never accepted the position of trustee in the first instance, she would have suffered no damages; a jury could readily infer that conclusion.

Even if Shelton had accepted the position as trustee, a jury could reasonably infer that if she had independent legal advice and full knowledge of the personal risks, she would have likely taken a different course in the litigation.[48]  She might have chosen not to file the New Hampshire

---

[48] Gallant opines that "Shelton should have been told by her attorney that acquiescing in the beneficiary client's demand for a far more aggressive approach to, and a higher risk in, the litigation would increase the level of potential *personal* liability" to her.  (Gallant Rep. ¶ 23) (emphasis in original).

complaint at all, or taken a substantially more prudent course, such as filing a petition for instructions.[49]  Shelton testified that she "would never have agreed to be a plaintiff in the [New Hampshire and Massachusetts lawsuits] if [she] knew what kind of position—potential risk [she] was facing."  (*Id.* at 815-16).  If she had never initiated or joined the litigation, she would have incurred no liability as a result of it.  Similarly, a jury could reasonably infer under the circumstances that the probate court would not have imposed personal liability if Shelton had simply filed a petition for instructions.  Significantly, Judge Cassavechia twice emphasized that the conduct of Shelton that led to the finding of bad faith was the filing and prosecution of the New Hampshire litigation.  *See* Order, N.H. Litigation (Aug. 18, 2010) ("The court finds that in bringing and prosecuting this litigation the petitioners have acted in bad faith."); Clarification of Order on Remand from Appeal, N.H. Litigation (Sep. 5, 2012) ("the fee award was based on Shelton and Betty's initiation and prosecution of the subject litigation, not for violation of the *in terrorem* clause per se.").

There are, however, inferences as to which expert testimony seems to be lacking, and that a lay person may not be competent to make.  For example, the Shelton Parties argue in substance that (1) if Denby had rendered appropriate advice, then (2) Shelton might have resigned as a trustee or sought to distance herself from Betty once it appeared that the litigation was not going well, (3) and therefore the probate court would not have imposed personal liability against Shelton.  That may well be true, but the only expert testimony on point is conclusory.[50]

---

[49] Gallant opines that filing a petition for instructions would "undoubtedly, from a fiduciary perspective[,] . . . have been vastly preferable to the complaint that was filed."  (Gallant Rep. ¶ 30).

[50] In his discussion of Weisman's breach of duty, Gallant observes:

. . . at trial . . . it became obvious that Elizabeth Tamposi had lied about her financial circumstances

Indeed, Gallant seems to assume that if Shelton had received independent legal advice after the December 2008 order, or after Betty's trial testimony in November and December 2009, she could have extricated herself from the situation and avoided personal liability.  The reality is undoubtedly much more complicated, and indeed there is a high probability that by that point it was too late to avoid any harm.  The court's ultimate order holding Shelton personally liable was based on its finding that she had acted in bad faith in a number of ways, including "creating controversy with the investment directors" in September 2007 and filing the lawsuit itself in October 2007.  (Order, N.H. Litigation (Aug. 18, 2010), at 15-16, 37, 45, 50).  Those actions had already taken place by the time of the trial; Shelton's resignation would not have erased them.

Although it is certainly possible that the probate court might have viewed Shelton more favorably if she had distanced herself from Betty, Gallant does not address either the specific steps Shelton should have taken (other than resignation) or what the likely consequences might have been.  Obviously, no expert could testify as to the thought processes of a judge, and no expert could precisely predict an outcome based on a counterfactual scenario.  But expert testimony could have elucidated what Shelton might have done to "distance" herself or otherwise to limit the potential damage, and the likelihood that those steps would have had the

---

and other matters. Judge Cassavechia already had warned of his intention to examine the Trustee's conduct in making various demands and in bringing the litigation.  The failure to consider Shelton's fiduciary options in the light of these developments and the decision to continue presenting Shelton as wholly aligned with Tamposi's positions led the Judge to punish Shelton for her "collusion."

Trial counsel (whether first or second chair) should have recognized the heightened risk to Shelton and have advised Shelton to distance herself from Elizabeth Tamposi.  At the very least, counsel should have taken steps to demonstrate that Shelton as a fiduciary acting in good faith was not complicit in the lies of Tamposi and thus had not "colluded" with her.

(Gallant Rep. ¶¶ 32-33) (citation omitted).  Gallant apparently intends that analysis to apply to Denby, as well.  (*See* Gallant Rep. Fn. 18).

desired effect.  It is true that Gallant opines that had she received proper advice, Shelton at the

very least could have made an "informed decision as to the proper course of action for herself."

(Gallant Rep. ¶ 36). Whether that is sufficient under the circumstances to establish a causal link

between the breach and the injury is unclear.[51]

There may, accordingly, be certain arguments that are foreclosed to the Shelton Parties.

That is not, however, a reason to grant summary judgment for the Denby Parties as to the

malpractice claim.  Taken as a whole, the evidence is sufficient to establish a causal link between

at least some portion of the alleged malpractice and the alleged injury, and summary judgment

for the Denby Parties will therefore be denied.

### D.     The W&M Parties' Motion for Summary Judgment

The Shelton Parties contend that the W&M Parties breached their duty to Shelton in

multiple ways:  (1) by failing to alert Shelton that she could be held personally liable in

connection with the New Hampshire litigation; (2) by filing the complaint in the New Hampshire

litigation; (3) by failing to protect Shelton's personal interests after Betty was impeached on

cross-examination; and (4) by dissuading her from resigning as trustee in the spring of 2010.

Gallant's expert report states:  "As with Denby's joint representation of her two clients,

Weisman and McIntyre subsumed the representation of Shelton in that of [Betty] and failed to

satisfy the standard of care they owed to Shelton as their fiduciary client."  (*Id.* ¶ 29).  He opines

that Weisman failed "to alert Shelton to the personal risk she was incurring as a result of the

filing of the complaint rather than a petition for instructions, as well as the potentially increased

risk from the aggressive nature of the prayers for relief."  (Gallant Rep. ¶ 30).  He cites to the

---

[51] It is also noteworthy that Shelton acknowledged at her deposition that in the spring of 2010 she decided
not to resign after receiving independent advice from separate counsel (as well as Weisman).  (Shelton Dep. at 842).

deposition testimony of Weisman for the proposition that Shelton's interests were not considered at various stages in the New Hampshire and Massachusetts litigation.  (*Id.* ¶¶ 30-31).  He further states:

> . . . Weisman owed his fiduciary client advice specifically addressed to her position. This need became acute as a result of the developments at trial, when it became obvious that Elizabeth Tamposi had lied about her financial circumstances and other matters. Judge Cassavechia already had warned of his intention to examine the Trustee's conduct in making various demands and in bringing the litigation. The failure to consider Shelton's fiduciary options in the light of these developments and the decision to continue presenting Shelton as wholly aligned with Tamposi's positions led the Judge to punish Shelton for her "collusion."

(*Id.* ¶ 32).  As noted above, Gallant further states that after Betty's testimony,

> [t]rial counsel (whether first or second chair) should have recognized the heightened risk to Shelton and have advised Shelton to distance herself from Elizabeth Tamposi.  At the very least, counsel should have taken steps to demonstrate that Shelton as a fiduciary acting in good faith was not complicit in the lies of Tamposi and thus had not "colluded" with her.

(Gallant Rep. ¶ 33).

> Gallant concludes that, like Denby,

> [Weisman] should have advised Shelton that by proceeding forward with the same trial plan as [Betty], she was at risk of surcharge liability (particularly in light of the Judge's warning), and she was at risk of an award of attorneys fees (in the light of the plain language of [N.H. Rev. Stat. Ann. §] 564-B:10-1004).

(*Id.* ¶ 36).[52]  He also opines that Weisman breached his duty to Shelton when he did not "urge[]

---

[52] Gallant goes on to explain:

While it is not uncommon for litigators without prior experience in such cases to look to trust counsel for guidance on technical issues, the circumstances presented here—a Judge specifically noting his intention to consider a surcharge and trial testimony by a client and key witness that was at odds with what had been previously said by her—go far beyond the scope of trust technicalities. The failure to advise Julie Shelton on her options and her risks in these circumstances does not comport with the ethical duty owed to her and it constituted a failure to meet the standard of care due to every client.

her emphatically to seek independent counsel" after "it became obvious [at the New Hampshire trial] that [Betty] had lied about her financial circumstances and other matters."  (*Id.* ¶¶ 32, 36).  He states that "[h]ad Weisman . . . given Shelton competent advice in these exigent circumstances it is reasonable to believe that the consequences, for her, would have been quite different."  (*Id.* ¶ 36).

The claims against Weisman thus largely parallel the claims against Denby.  They are, however, arguably materially different in two respects:  first, Weisman was trial counsel, not an expert on the law of trusts; and second, the time frame of Weisman's representation does not align exactly with that of Denby, and therefore his involvement with Shelton's representation was slightly different.

It is undisputed that Denby was understood by all parties to be Shelton's trust counsel.  Weisman, by contrast, had (and was known by Shelton to have) little or no experience with trusts, and did not hold himself out as an expert in the duties and obligations of trustees or the administration of trusts.  He was not part of the initial discussions between Denby and Shelton, and did not render advice as to the possible pitfalls of becoming a trustee.  To the extent, therefore, that the alleged malpractice concerned Shelton's decision to become a trustee in the first instance, there is no evidence that Weisman either had a relevant duty or breached it.

The filing of the New Hampshire complaint, however, is a different story.  The Shelton Parties contend that Weisman "put [] Shelton in harm's way by filing the New Hampshire [litigation]."  (Shelton Parties Opp. at 19).  They point to the probate court's statement in its August 18, 2010 order that Shelton had acted in bad faith "in bringing and prosecuting th[e New

---

(*Id.* ¶ 37).

Hampshire] litigation" as well as the court's specific references in the order to certain remedies sought by the pleadings.  (Order, N.H. Litigation (Aug. 18, 2010), at 47 ("The remedies sought by petitioners, including the removal of the investment directors and the 'decoupling' (or buy-out) of the EMT Trusts from the other trust assets, are yet other manifestation of their wish to challenge provisions of the SAT, Sr. Trust.")).  They conclude that Weisman necessarily breached his duty to Shelton, because some of the actions that she was held to have taken in bad faith (filing the complaint and including certain requests for relief) were actions that he in fact took as her attorney.

Again, it is true that Weisman was not an expert in the field of trusts.  Nonetheless, as lead counsel in the litigation, he had an obligation to ensure that the claims asserted in the complaint were properly supported in law and fact, and that his client was properly informed of the risks of litigation.  The probate court found that the filing of the complaint itself was an act of bad faith, as was its prosecution.  As lead litigation counsel, Weisman bears substantial responsibility for the content of the complaint.

Furthermore, Weisman specifically acknowledged that he deferred entirely to Betty when she emphatically rejected the possibility of filing a petition for instructions, and insisted on filing the complaint.  (Weisman Dep. at 34-36, 47).  Gallant opines that Weisman had a duty to alert Shelton to the personal risk she was incurring by filing a complaint rather than a petition for instructions, "as well as the potentially increased risk from the aggressive nature of the prayers for relief," and failed to do so.  (Gallant Rep. ¶ 30).   Under the circumstances, a reasonable jury could find that Weisman breached his duty of care and that the breach caused injury to Shelton by the filing and prosecution of the complaint.

The remaining claims against Weisman are similar to the claims against Shelton, with at least one addition:  the Shelton Parties contend that Weisman breached his duty to Shelton by expressly dissuading her from resigning in 2010, and that some portion of her harm may have been avoided if she had resigned at that time.[53]  However, there is little, if any, evidence to support a causal link between that alleged breach and Shelton's injury.  Again, the probate court's finding of bad faith was premised on the filing and prosecution of the complaint; there is no obvious reason that a resignation by Shelton after the conclusion of the trial would have affected the court's ruling in any way.  The probate court also expressly acknowledged that "Shelton d[id] not wish to continue serving as trustee for the long-term."  (Order at 50, N.H. Litigation (Aug. 18, 2010)).  Gallant does not directly address the issue in his report. And Shelton acknowledged that she obtained independent legal advice and decided not to resign.

Again, however, the fact that certain aspects of the claim for malpractice may fail for lack of evidence does not mean that the claim should be dismissed in its entirety.  There is sufficient evidence to support a claim of legal malpractice against Weisman, and the motion for summary judgment will therefore be denied.

### E.    McIntyre's Individual Motion for Summary Judgment

McIntyre seeks summary judgment as to her individual liability on the ground that her conduct did not cause any of the injuries to the Shelton Parties as a matter of law.  She contends that she played a relatively minor role in the representation of Shelton and that Shelton did not rely on any of her advice or judgment.  Based on that premise, she concludes that nothing she said or failed to say was a "substantial factor . . . in producing" any harm to the Shelton Parties.

---

[53] By that point, it appears that Denby had in fact withdrawn from the representation of Shelton.

*See Bruckner*, 131 N.H. at 548, 563 A.2d at 434.

In general, Gallant treats Weisman and McIntyre the same when discussing their breaches of duty.  (*See, e.g.*, Gallant Rep. ¶¶ 28, 29, 36, 37).  He further opines that, in his view, "[a]lthough Attorney McIntyre's involvement . . . was less extensive than that of Attorney Weisman, she nevertheless played an important role [in the litigation]" and therefore "owed her client Julie Shelton the benefit of advice regarding the legal options open to her, individually, and not merely as a part of [Betty]'s case."  (*Id.* ¶¶ 34, 37).

McIntyre contends that the record makes clear that Shelton principally relied on Weisman and Denby for advice relating to the New Hampshire litigation, and that there is no evidence to support the inference that differing advice from McIntyre would have had a meaningful impact on Shelton's conduct.

First, she notes that the engagement letter between Shelton and W&M explicitly incorporated the terms under which W&M agreed to represent Betty, including the statements that Weisman would be "principally responsible" for her representation, and that he "may assign projects relating to the case to other lawyers or other personnel at WM under [his] supervision" while "continu[ing] to be responsible to [Betty and Shelton] for the entire assignment."[54]

Second, McIntyre points to various statements made by Shelton at her deposition that, she contends, indicate that Shelton was relying on Weisman and Denby for advice rather than McIntyre.  Those include her statement that when consulting with W&M about whether to file the New Hampshire litigation, "it was only Michael at that point"; her statement that McIntyre

---

[54] The engagement letter between Shelton and W&M, sent to Shelton on July 16, 2008, stated that it "confirm[ed] that the terms on which this firm has represented and shall continue to represent you as trustee of the [EMT Trusts] shall be set forth in [Weisman's] letter to Betty dated September 21, 2007."  (Dkt. No. 53, Ex. 2).

"wasn't really very involved" as of October 22, 2007 (after the filing of both the New Hampshire

and Massachusetts lawsuits); and her statement that "Michael made the trial lawyer decisions at

trial."  (Shelton Dep. at 112, 127-28, 217).

Third, McIntyre cites to Shelton's explanation at her deposition that, after reading Judge

Cassavechia's December 2008 order, she chose not to resign as trustee because "neither of [her]

counsel advised [her] that [she] should consider resigning."  (Shelton Dep. at 816).  According to

McIntyre, the use of the word "neither," rather than "none," clearly indicates that Shelton was

contemplating only two attorneys—Denby and Weisman.

Fourth, McIntyre cites to the prayers for relief that were included in the amended

complaint in the New Hampshire litigation.  One of the prayers for relief in that document was

for the court to "[o]rder [r]espondents to cooperate with [Betty] in causing the restructuring of

her ownership interests in the Gifted Assets."  (N.H. Litigation Am. Compl. at 18).  According to

McIntyre, that requested remedy was included even though her own research had left her "quite

convinced that the probate court did not have jurisdiction over anything related to the gifted

assets."  (McIntyre Dep. at 37).  She testified at her deposition that she voiced that opinion to the

group, but that her opinion did not prevail in the discussion.  (*Id.*).

Finally, McIntyre cites to the portion of Shelton's deposition where she was asked about

her discussions with counsel after Betty's damaging trial testimony.  Shelton testified:

> Q.  And you discussed with Betsy and Michael how to handle [Betty]'s
>     cross—her cross-examination testimony, correct?
>
> A.  I don't know if I discussed it with Betsy or not.  I remember discussing it
>     with Michael.

(Shelton Dep. at 846).  McIntyre thus contends that because Shelton could not even remember

discussing the testimony with her, any advice she gave or did not give could not have been relevant to her decisions or actions in response to the testimony.

In sum, McIntyre contends that she played a relatively minor role, and that the record is devoid of any evidence that Shelton ever relied on her advice.  That argument has a certain degree of force, and the Court is not blind to the realities facing lawyers who are (or are perceived to be) secondary members of a litigation team.  However, McIntyre was no mere junior associate; she was Weisman's partner.  She played a role in drafting the complaint, the filing of which was a substantial basis for the finding of bad faith by the probate court. Moreover, the Shelton Parties are not asserting liability against her on the basis of affirmatively mistaken advice upon which Shelton allegedly relied to her detriment; rather, they contend that McIntyre negligently failed to advise Shelton on important matters (including on the desirability of independent counsel after Betty's testimony) and that Shelton would have relied on McIntyre's advice if she had provided it.  Although McIntyre has adduced evidence tending to prove that Shelton would not have done so, ultimately the Court cannot conclude, as a matter of law, that Shelton would not have listened to or relied on McIntyre's advice.  That determination is properly for the jury.

Accordingly, McIntyre's individual motion for summary judgment will be denied.

## IV.   <u>Conclusion</u>

For the reasons set forth above:

1.    The motion by the Denby Parties (Stephanie Denby and Burke Warren MacKay & Serritella, P.C.) for summary judgment as to the cross-claims of Butler, Rubin, Saltarelli & Boyd LLP and Baker & Daniels, LLP, is GRANTED.

96

2.     The motion by the Denby Parties (Stephanie Denby and Burke Warren MacKay
       & Serritella, P.C.) for summary judgment as to the cross-claims of the Shelton
       Parties (Julie Shelton, Butler, Rubin, Saltarelli & Boyd LLP, and Baker &
       Daniels, LLP) is DENIED.

3.     The motion by the W&M Parties (Michael Weisman, Rebecca McIntyre, and
       Weisman & McIntyre, P.C.) for summary judgment is DENIED.

4.     The motion by Rebecca McIntyre for summary judgment is DENIED.

**So Ordered.**


                                          /s/ F. Dennis Saylor
                                          F. Dennis Saylor IV
Dated: September 30, 2015                 United States District Judge